IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

OCT 2 0 2003

CLERK, U.S. DISTRICT COURT
By _____
Deputy

| | |
|---|---|
| YVONNE CAUDILLO by next friend Brenda Caudillo; MIRAH EPSTEIN CURZER by next friend Howard Curzer; and LUBBOCK HIGH SCHOOL GAY STRAIGHT ALLIANCE, an unincorporated association, § § § § § § | |
| Plaintiffs § § | |
| v. § § § | Civil Action No. 5-03CV0165-C |
| LUBBOCK INDEPENDENT SCHOOL DISTRICT; WAYNE HAVENS, in his official capacity as Acting Superintendent of Lubbock Independent School District; DR. JACK CLEMMONS, individually; FRED HARDIN, in his official capacity as Assistant Superintendent for Secondary Schools of Lubbock Independent School District, § § § § § § § § § | |
| Defendants § § | |

---

**DEFENDANTS', LUBBOCK INDEPENDENT SCHOOL DISTRICT, WAYNE HAVENS, In His Official Capacity as Acting Superintendent of Schools, and FRED HARDIN, In His Official Capacity as Assistant Superintendent for Secondary Schools, BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

---

Ann Manning
R. Michael McCauley, Jr.
Timothy T. Pridmore
McWHORTER, COBB & JOHNSON, L.L.P.
P.O. Box 2547
Lubbock, Texas 79408-2547
Phone:       (806) 762-0214
Facsimile:   (806) 762-8014

ATTORNEYS FOR DEFENDANTS, LUBBOCK INDEPENDENT SCHOOL DISTRICT, WAYNE HAVENS and FRED HARDIN



# TABLE OF CONTENTS

I.      **INTRODUCTION** ........................................................ 2

II.     **ISSUES OF LAW** ........................................................ 3

III.    **STANDARD OF REVIEW** .............................................. 3

IV.    **FACTUAL BACKGROUND** ............................................. 5

V.      **ARGUMENTS AND AUTHORITIES** .................................... 7

     A.     Havens and Hardin, sued in their official capacities, are not "persons" under § 1983 for purposes of suit because they assume the identity of LISD .......................................... 7

     B.     Issues of Law No. 1 ............................................... 8

         1.     LISD policy and custom regarding limited open forum is not unconstitutional ........................................ 10

         2.     Plaintiffs cannot establish that LISD's policymakers had knowledge that the policy was unconstitutional .................... 11

         3.     No constitutional violation occurred ............................ 12

             (a)     LISD invoked the well-being exception based on sexual content speech and sexual activity .................. 13

             (b)     In light of the purpose served by the forum, the well-being exception is invoked because of the constitutionally permissible distinctions between children and adults ................................... 23

             (c)     There is no viewpoint discrimination and the Equal Access Act is not violated when invoking the exception for maintaining order and discipline ........... 28

         4.     The custom or policy did not serve as the moving force behind the violation, if any, because LISD did not act with deliberate indifference to Plaintiffs' constitutional or statutory rights ........................................ 32

5.    Summary .................................................. 35

C.    Issue of Law No. 2 ............................................. 35

1.    The LISD policy or custom is constitutional and the
policymakers knew of no unconstitutional policy or
custom .................................................. 36

2.    Regardless of Plaintiffs' claims, no constitutional
violation occurred ........................................ 38

(a)    Defendant did not violate Plaintiffs' First
Amendment right of speech and association
since there was a compelling state interest ................. 39

(b)    There is no viewpoint discrimination and the
Equal Access Act is not violated when invoking
the exception for maintaining order and
discipline ......................................... 41

3.    No LISD custom or policy served as the moving force
behind any violation, if any, because LISD did not act
with deliberate indifference to Plaintiffs' constitutional
rights .................................................. 42

VI.    **CONCLUSION** ................................................... 45


# INDEX OF AUTHORITIES

**FEDERAL CASES**                                                                                    **Page**

*Abington Sch. Dist. v. Schempp*, 374 U.S. 203 (1963) ................................. 27

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986)
    (quoting Fed.R.Civ.P. 56(c)) ........................................... 3, 4

*Bd. of the County Comm'rs v. Brown*, 520 U.S. 397, 403 (1997) ........................ 9

*Bd. of Educ. v. Earls*, 536 U.S. 822 (2002) ........................................ 23

*Bd. of Educ. v. Pico*, 457 U.S. 853 (1982) ........................................ 25

*Bellotti v. Baird*, 443 U.S. 622 (1979) ........................................... 23

*Benavides v. Countyo f Wilson*, 955 F.2d 968 (5th Cir. 1989)
    cert. den. 101 S.Ct. 2617 (1990) ...................................... 32, 43

*Bethel Sch. Dist. v. Fraser*, 478 U.S. 675  (1986) ................ 11, 25, 27, 36, 37, 38, 40

*Blackwell v. Issaquena County Bd. of Edu.*, 363 F.2d 749 (5th Cir. 1966) ............... 37

*Butts v. Dallas Ind. Sch. Dist.*, 436 F.2d 728 (5th Cir. 1971) ..................... 12, 29, 41

*Celotex Corp v. Catrett*, 477 U.S. 317, 325 (1986) ................................. 3, 4

*City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789 (1984) .............. 13

*City of Canton v. Harris*, 489 U.S. 378 (1989) ................................. 32, 42, 43

*Clark v. Dallas ISD*, 806 F.Supp. 116 (N.D. Tex. 1992) ........................... 37, 38

*Cornelius v. NAACP Legal Def. and Educ. Fund, Inc.*, 473 U.S. 788 (1985) ............. 13

*Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629 (1999) ........................ 28, 41

*Edwards v. Aguillard*, 42 U.S. 578 (1987) ...................................... 27, 28

*Eisner v. Stamford Bd. of Educ.*, 440 F.2d 803 (2nd Cir. 1971) .................... 29, 41

*Eugene v. Alief Independent School District*, 65 F.3d 1299, 1304 (5th Cir. 1995) ........... 9

*Ginsberg v. State of New York*, 390 U.S. 629 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 25

*Gonzalez v. Ysleta Ind. Sch. Dist.*, 996 F.2d 745 (5th Cir. 1993) . . . . . . . . . . . . . . . . . . . . 33, 43

*Good News Club v. Milford Central School*, 533 U.S. 98 (2001) . . . . . . . . . . . . . . . . . . . . . . 12

*Greer v. Spock*, 424 U.S. 828 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Hafer v. Melo*, 502 U.S. 21, 26 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988) . . . . . . . . . . . . . . . . . . . . . 12, 37, 38

*Jett v. Dallas Ind. Sch. Dist.*, 491 U.S. 701 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Johnson v. Moore*, 958 F.2d 92, 94 (5th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Kansa Reinsurance Co. v. Cong. Mortgage Corp.*, 20 F.3d 1362, 1371 (5th Cir. 1994) . . . . . . . 4

*Kentucky v. Graham*, 473 U.S. 159, 166 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 9

*Lawrence v. Texas*, 123 S.Ct. 2472 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Lujan v. National Wildlife Federation*, 497 U.S. 871, 884 (1990) . . . . . . . . . . . . . . . . . . . . . . 4

*Matsushita Elec Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) . . . . . . . . . . . . . 4

*Meadowbriar Home for Children, Inc. v. Gunn*, 81 F.3d 521, 532-33 (5th Circ. 1996) 10, 11, 12

*Medina v. Denver*, 960 F.2d 1493 (10th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . 33, 34, 43, 45

*Monell v. Dept. of Social Servs.*, 436 U.S. 658 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 33

*New Jersey v. TLO*, 469 U.S. 325 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Norton v. Discipline Comm. of East Tennessee St. Univ.*, 419 F.2d 195 (6th Cir. 1969)
     cert den'd, 399 U.S. 906 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Oden v. Oktibbeha County*, 246 F.3d 458, cert. den. 534 U.S. 948 (2001) . . . . . . . . . . . . . . . . 9

*Oviatt v. Pearce*, 954 F.2d 1470 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 43

*Owen v. Independence*, 445 U.S. 622 (1980) ........................................ 33

*Pembaur v. Cincinnati*, 475 U.S. 469, 483 (1986) ................................. 8, 33

*Prince v. Massachusetts*, 321 U.S. 158 (1944) ...................................... 24

*Procunier v. Navarette*, 434 U.S. 555 (1978) ................................... 33, 43

*Quarterman v. Byrd*, 453 F.2d 54 (4th Cir. 1971) .................................... 12

*Qutb v. Strauss*, 11 F.3d 488, cert. den. 511 U.S. 1127 (1994) .......................... 24

*Resolution Trust Corp. v. Sharif-Munir-Davidson Dev. Corp.*,
    992 F.2d 1398, 113 S.Ct. 187 (5th Cir. 1993) .................................. 4

*Richards v. Thurston*, 424 F.2d 1281 (1st Cir. 1967) .............................. 29, 41

*Roberts v. United States Jaycees*, 468 U.S. 609 (1984) ........................... 39, 40

*Rosenberger v. Rector and Visitors of Univ. of Virginia*, 515 U.S. 819 (1995) ............. 12

*Schleifer v. City of Charlottesville*, 159 F.3d 843 (4th Cir. 1998),
    cert den. 526 U.S. 1018 (1999) ......................................... 24, 26

*Shanley v. Northeast Ind. Sch. Dist.*, 462 F.2d 960 (5th Cir. 1972) ............. 12, 29, 31, 41

*Tinker v. Des Moines Ind. Smty. Sch. Dist.*, 393 U.S. 503 (1969) ..................... 27, 36

*United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) ............................... 4

*Vernonia Sch. Dist. v. Acton*, 515 U.S. 646 (1995) .................................. 39

*Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) ......................... 8

## STATE CASES

*Bastrop ISD v. Toungate*, 958 S.W.2d 365 (Tex. 1997) ............................... 23

*Shoemaker v. State*, 971 S.W.2d 178 (Tex. App. - Beaumont 1998) ..................... 23


**STATE STATUTES**

TEX. ALCO. BEV. CODE ANN. §§106.01-02 (Vernon 2003) .............................. 24

TEX. FAM. CODE ANN. § 262.001 (Vernon 2003) ..................................... 24

TEX. LOCAL GOVT. CODE ANN. § 351.903 ........................................... 24

TEX. PENAL CODE ANN. §21.06 (Vernon 2003) ...................................... 13

TEX. PENAL CODE ANN. §21.11 ........................................ 14, 15, 24, 25

TEX. PENAL CODE ANN. §22.015 (Vernon 2003) ..................................... 24

TEX. PENAL CODE ANN. §46.13 (Vernon 2003) ...................................... 24

TEX. PENAL CODE ANN. §71.002 .................................................... 24

TEX. TRANSP. CODE ANN. § 729.001 (Vernon 2003) ................................. 24

**FEDERAL STATUTES**

13 U.S.C. § 1301 ............................................................ 16, 26

20 U.S.C. §1681(a)(2003) .................................................... 28, 41

20 U.S.C. § 4071 .............................................. 2, 5, 9, 11, 12, 22

28 U.S.C. § 2201-02 ............................................................. 2

42 U.S.C. § 1983 ............................................................... 2

42 U.S.C. § 1988 ............................................................... 2

FED. R. CIV. P. 25(d)(1) ....................................................... 7

FED. R. CIV. P. 56(c) .......................................................... 3



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| YVONNE CAUDILLO by next friend Brenda Caudillo; MIRAH EPSTEIN CURZER by next friend Howard Curzer; and LUBBOCK HIGH SCHOOL GAY STRAIGHT ALLIANCE, an unincorporated association, | § § § § § § | |
| Plaintiffs | § § | |
| v. | § § | Civil Action No. 5-03CV0165-C |
| LUBBOCK INDEPENDENT SCHOOL DISTRICT; WAYNE HAVENS, in his official capacity as Acting Superintendent of Lubbock Independent School District; DR. JACK CLEMMONS, individually; FRED HARDIN, in his official capacity as Assistant Superintendent for Secondary Schools of Lubbock Independent School District, | § § § § § § § § § | |
| Defendants | § | |

---

## DEFENDANTS, LUBBOCK INDEPENDENT SCHOOL DISTRICT, WAYNE HAVENS, In His Official Capacity as Acting Superintendent of Schools, and FRED HARDIN, In His Official Capacity as Assistant Superintendent for Secondary Schools, BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

---

TO THE HONORABLE SAM R. CUMMINGS, DISTRICT JUDGE:

COMES NOW Defendant, Lubbock Independent School District ("LISD"), WAYNE

HAVENS, in his official capacity as Acting Superintendent of Lubbock Independent School District

---

("Havens"), and Fred Hardin, in his official capacity as Assistant Superintendent for Secondary Schools of Lubbock Independent School District ("Hardin"), and file this their Brief in Support of Motion for Summary Judgment and respectfully ask the Court to render final summary judgment against Plaintiffs and would show the Court the following:

## I.

## INTRODUCTION

1.   **Parties**

   a.   Plaintiffs are Yvonne Caudillo, by next friend Brenda Caudillo, Mirah Epstein Curzer by next friend Howard Curzer, and Lubbock High School Gay Straight Alliance, an unincorporated association, which was formerly known as GAP Youth.

   b.   Defendants filing this Motion are Lubbock Independent School District, Wayne Havens, in his official capacity as Acting Superintendent of Lubbock Independent School District, and Fred Hardin, in his official capacity as Assistant Superintendent for Secondary Schools of Lubbock Independent School District. Defendant, Jack Clemmons, sued only in his individual capacity, has previously filed his Motion for Summary Judgment on qualified immunity.

2.   On July 8, 2003, Plaintiffs sued Defendants for violations of the Equal Access Act, 20 U.S.C. § 4071 *et seq* and violations of the First Amendment to the United States Constitution pursuant to the Civil Rights Act of 1871, 42 U.S.C. §§ 1983 and 1988 ("§ 1983") and for Declaratory Relief pursuant to 28 U.S.C. §§2201-02.

3.   On July 30, 2003, Defendants filed their answers with the Court asserting affirmative defenses.

4.      LISD, Havens and Hardin file this Motion for Final Summary Judgment on the Plaintiffs'

causes of action. Summary judgment should be granted in this cause because there is no genuine

issue of material fact on any key elements of Plaintiffs' cause of action.

## II.

### ISSUES OF LAW

1.      Whether LISD, Havens and Hardin are entitled to summary judgment as a matter of

law based on Plaintiffs' claims that LISD has a policy or custom which violates the Equal Access

Act.

2.      Whether LISD, Havens and Hardin are entitled to summary judgment as a matter of

law based on Plaintiffs' claims that LISD has a policy or custom of abridging Plaintiffs' freedom of

speech and association by denying access to a limited public forum on the basis of the content and

viewpoint of their speech.

## III.

### STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate

when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with

the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247

(1986) (quoting FED. R. CIV. P. 56 (c)). When the ultimate trial burden rests with his opponent, the

movant need only "[point] out to the district court" an absence of evidence to support the opponent's

case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). Once a properly supported motion for

---

summary judgment is presented, the burden shifts to the non-moving party who bears the burden of

proof at trial to show with "significant probative" evidence that a triable issue of fact exist. *Kansa*

*Reinsurance Co. v. Cong. Mortgage Corp.*, 20 F.3d 1362, 1371 (5th Cir. 1994); *See, also Lujan v.*

*National Wildlife Federation*, 497 U.S. 871, 884 (1990); *Celotex Corp.*, 477 U.S. at 322-324.

Whether a fact is material depends upon whether it will affect the outcome at trial. *Resolution Trust*

*Corp. v. Sharif-Munir-Davidson Dev. Corp.* 992 F.2d 1398, 113 S.Ct. 187 (5th Cir. 1993). This

standard is akin to that for a directed verdict. *Anderson*, 477 U.S. at 250-51. The Court's function

is not to determine the "true" facts of the case, but only to determine if "there is sufficient evidence

favoring the non-moving party for the jury to return a verdict for that party." *Anderson*, 477 U.S.

at 249. The court ignores "colorable" or insignificant evidence and renders judgment if the record

supports one reasonable conclusion." *Anderson*, 477 U.S. at 249-51. In making this determination,

the court must view the evidence in the light most favorable to the non-movant, affording the party

the benefit of all reasonable impressions that can be drawn therefrom. *United States v. Diebold, Inc.*,

369 U.S. 654, 655 (1962). If, under such a view of the evidence, it is clear that no more than a

"metaphysical doubt" exists as to the material facts of the case, and that the movant is clearly entitled

to judgment under those facts, then summary judgment is appropriate. *Matsushita Elec. Indus. Co.*

*v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).



## IV.

## FACTUAL BACKGROUND

Prior to the parties taking depositions, a statement of uncontroverted facts was agreed to by the parties, a copy of which is attached hereto. [App. at 512]. The following provides the Court with additional uncontroverted facts.

LISD adopted a limited open forum by virtue of its Board Policy FNAB (LEGAL), which also incorporates the Equal Access Act, 20 U.S.C. § 4071 *et seq*. [App. at 519]. LISD has adopted a longstanding abstinence policy applying to all matters concerning sexual activity. [App. at 521]. In its abstinence policy, LISD takes the position that there is no such thing as safe sex outside of a monogamous relationship. [App. at 528] LISD permits discussion of the ramifications of sexual activity, but not the sexual activity itself. [App. at 528].

On September 12, 2002, Plaintiffs requested permission to advertise their school club, Gay and Proud Youth ("GAP Youth"), via posting fliers in the halls of Lubbock High School ("LHS"), as well as making announcements over the P.A. system. [App. at 559, Caudillo Dep.89:16-24; App. at 593]. GAP Youth is now known as Lubbock Gay Straight Alliance ("GSA"). [Pl. Compl. ¶ 11]. This request was made by Rene Caudillo, then GAP Youth president, to the Lubbock High School ("LHS") principal, Doyle Vogler ("Vogler"). [App. at 559, Caudillo Dep. 91:8-9] Vogler reviewed the website and denied their request. [App. at 526].

Thereafter, Ricky Waite ("Waite") and Rene Caudillo ("Caudillo") made a presentation to Fred Hardin ("Hardin"), the then Assistant Superintendent for Secondary Education. [App. at 559, Caudillo Dep. 90:3-5]. Prior to that time, Hardin had reviewed the website which was posted on the

fliers. [App. at 598, Hardin Dep. 12:24-13:10]. Hardin found the content of the website material to be inappropriate. [App. at 612, Hardin Dep. 67:18, 70:4]. Caudillo himself agreed that the website material was inappropriate. [App. at 559, Caudillo Dep. 92:7-24] Hardin denied the request based on the LISD abstinence policy, federal law and State law [App. at 528], which invoked the well-being exception to the Equal Access Act. [App. at 528]. Further, he denied the request based on the disruption exception to the Equal Access Act. [App. at 602, Hardin Dep. 25:13-29, 26:1-25, 27:1-17]. Thereafter, Waite and Caudillo made a formal written request to LISD Superintendent and the members of the School Board to be placed on the November 14, 2002, Board agenda to have permission to post fliers. Included in the written request was a list of goals and other information. The stated goals in this request included:

1. Provide guidance to youth who come to us to the best of our ability and when we cannot provide help relay them to those who can.

2. Educate those willing about non-heterosexuals.

3. Improve the relationship between heterosexuals and homosexuals.

4. Help the community.

5. Increase rights given to non-heterosexuals.

6. Educate willing youth about safe sex, AIDS, hatred, etc.

7. Enhance the relationship between youth and their families.

Also, the letter stated, "We will not be the ones making the decisions about their sexuality and we will be working with other organizations, councilors [sic], etc. to provide the best help available."

[App. at 593]. Following the Board presentation by Ricky Waite, the Board of Trustees took no action. [App. at 629]. However, GAP Youth was not allowed to post their fliers.

Thereafter, on or about December 19, 2002, prior to the Christmas holidays, Waite made a request to Vogler to allow GAP Youth to meet on campus. [App. at 613, Hardin Dep. 72:16-20]. Vogler denied the request. [App. at 613, Hardin Dep. 72:16-20]. On that same date, Waite made a written request to Hardin requesting that GAP Youth be allowed to meet on campus. [App. at 613-614, Hardin Dep. 72:21-25, 73:1]. Following the Christmas break, in January 2003, Hardin again reviewed the website which contained links to material with sexual content [App. at 614, Hardin Dep. 73:5-25; 74:1-2]. As a result, he then phoned Waite to deny his request. [App. at 526].

**V.**

**ARGUMENTS AND AUTHORITIES**

**A.**     **Havens and Hardin, sued in their official capacities, are not "persons" under § 1983 for purposes of suit because they assume the identity of LISD.**

This suit against Havens, sued in his official capacity of acting Superintendent of Schools, is in reality a suit against the office in which Havens holds. *Hafer v. Melo*, 502 U.S. 21, 26 (1991). During the time of the case at bar, Clemmons was Superintendent of Schools. Thus, his successor, Havens, automatically assumed the role in the litigation pursuant to FED. R. CIV. P. 25(d)(1). In reality, the real party in interest in an official capacity suit is the governmental entity and not the named official. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Suits against state officials who are sued in their official capacity are treated as suits against the State. *Id.*

Likewise, Hardin was sued only in his official capacity of Assistant Superintendent for Secondary Schools of LISD. Thus, a suit against Havens and Hardin is a suit against the governmental entity, LISD, and not Hardin nor Havens, individually. *Id.*

Notwithstanding, for purposes of this Motion for Summary Judgment, all defenses and arguments made for LISD are also made on behalf of and are incorporated herein for both Havens and Hardin in their pled capacities.

**B:**     **Issue of Law No. 1:**     **Whether LISD is entitled to summary judgment as a matter of law since LISD has no policy or custom which violates the Equal Access Act.**

While a school district may be held liable in a case brought pursuant to § 1983, a school district can be found liable only when the municipality itself causes the constitutional deprivation. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). The U.S. Supreme Court held in *Pembaur v. Cincinnati*, 475 U.S. 469, 483 (1986), that "[m]unicipal liability under § 1983 is not based on respondeat superior, rather it attaches---and only where---a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." To establish liability under §1983 for a school district, a complainant must demonstrate a policy or custom which causes or occasions a constitutional depravation. *Monell v. Dept. of Social Servs.*, 436 U.S. 658 (1978).

In order for Plaintiffs to prevail, they must meet the requirements set out in § 1983 cases. *Jett v. Dallas Ind. Sch. Dist.*, 491 U.S. 701 (1989). The Supreme Court held that Congress intended §1983 to be the sole remedy for discrimination by persons acting under color of state law. *Jett*, 491 U.S. at 731. In *Jett*, the plaintiffs alleged a § 1981 violation and because §1983 provided a remedy

against persons acting under color of state law, the Court declined to imply a cause of action under § 1981 independent of § 1983. *Id.* Thus, the § 1983 standards were applied to *Jett*'s §1981 cause of action.

Likewise, in the case at bar, Plaintiffs are using § 1983 to provide the remedy for Defendants' alleged violation of the Equal Access Act, 20 U.S.C. § 4071 (2003) *et seq* ("Equal Access Act") and First Amendment claims. Thus, their causes of action cannot be independent of § 1983, and Plaintiffs must comply with § 1983 requirements in order to attach liability for LISD. [1]

The backdrop under which a local government can be held liable pursuant to § 1983 is only when a governmental entity's official policy or custom causes a person to be deprived of a federally protected right. *Bd. of the County Comm'rs v. Brown*, 520 U.S. 397, 403 (1997). Official policy is defined as

> (1) a policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the [district]...or by an official to whom the [d]istrict has delegated policy-making authority; or
>
> (2) a persistent widespread practice of [district] officials or employees which although not authorized but officially adopted and promulgated policy is so common and well settled as to constitute a custom that fairly represents [district] policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the district or an official to whom the body has delegated policy-making authority.

*Eugene v. Alief Independent School District*, 65 F.3d 1299, 1304 (5th Cir. 1995) (alterations in original) (citing *Johnson v. Moore*, 958 F.2d 92, 94 (5th Cir. 1992).

---

[1] This § 1983 remains the only provision to expressly create a remedy against persons acting under color of state law even after the 1991 amendments. Oden v. Oktibbeha County, 246 F.3d 458, 463, cert. den. 534 U.S. 948 (2001).

To recover under a theory regarding an unconstitutional policy, a plaintiff must plead and prove each of the following four elements:

(1)     an unconstitutional policy existed;

(2)     the governmental policymakers actually or constructively knew of its existence;

(3)     a constitutional violation occurred; and

(4)     this custom or policy served as the moving force behind the violation.

*Meadowbriar Home for Children, Inc. v. Gunn*, 81 F.3d 521, 532-33 (5th Cir. 1996). The four elements are addressed below. LISD asserts that Plaintiffs cannot meet all of the elements set forth in *Meadowbriar*.

### 1.     LISD policy and custom regarding limited open forum is not unconstitutional.

Plaintiffs complain that Defendants denied them equal access to a limited open forum on the basis of the content and viewpoint of their speech in violation of the Equal Access Act. Plaintiffs cannot meet the elements to infer liability under § 1983.

First, the policy at issue is LISD Board Policy FNAB (LEGAL), wherein the Board has established a limited open forum pursuant to the Equal Access Act. [App. at pp. 28-30]. The Equal Access Act states, to-wit:

> (a) Restriction of limited open forum on basis of religious, political, philosophical, or other speech context prohibited. It shall be unlawful for any public secondary school which receives Federal financial assistance and which has a limited open forum to deny equal access or a fair opportunity to, or discriminate against, any students who wish to conduct a meeting within that limited open forum on the basis of the religious, political, philosophical, or other content of the speech at such meetings.
>
> . . .



(f) Authority of schools with respect to order, discipline, well-being, and attendance concerns. **Nothing in this title [20 USCS §4071 et seq.] shall be construed to limit the authority of the school, its agents or employees, to maintain order and discipline on school premises, to protect the well-being of students** and faculty, and to assure that attendance of students at meetings is voluntary.

20 U.S.C. § 4071 (2003) (emphasis added).

Plaintiffs cannot establish that LISD's policy is unconstitutional. First, the policy is based on the federal statute, Equal Access Act. Second, the Board adopted its policy in compliance with the Equal Access Act. [App. at 519]. Third, LISD officials appropriately implemented the exceptions stated in section (f), protection of the well-being of students and maintaining order and discipline. [App. at 641, 644, Clemmons Dep. 25:8-21, 34:1-17, 45:6-25, 46:1-25, 47:1-20; App. at 530; App. at 600, 601, Hardin Dep. 19:9-25, 20:1-25, 21:1-12]. Thus, the policy or custom is not unconstitutional and Plaintiffs cannot prove this element.

> **2.    Plaintiffs cannot establish that LISD's policymakers had knowledge that the policy was unconstitutional.**

As to the second *Meadowbriar* element, Plaintiffs have no evidence to prove that LISD policymakers knew that the policy was unconstitutional. *Meadowbriar* 81 F.3d at 532-33. To the contrary, in September 2002 through January 2003 Clemmons, Haven and Hardin were aware that there were no reported cases in the Fifth Circuit nor the U.S. Supreme Court that addressed recognition of clubs under the Equal Access Act based on sex and sexual activity in a secondary public school where students twelve years of age and older are involved. [App. at 672-673; App. at 530]. Further, the U.S. Supreme Court had previously held in *Bethel Ind. Sch. Dist. v. Fraser*[2] and

---

[2] *Bethel Sch. Dist. v. Fraser*, 478 U.S. 675 (1986).

*Hazelwood Sch. Dist. v. Kuhlmeier*[3] that authority given to regulate speech with a sexual content was constitutional. Additionally, case law existed which authorized LISD to regulate speech and association where there was a "reasonable forecast" of disruption. *Butts v. Dallas Ind. Sch. Dist.*, 436 F.2d 728, 731 (5th Cir. 1971); *Norton v. Discipline Comm. of East Tennessee St. Univ.*, 419 F.2d 195, (6th Cir. 1969) cert. den'd, 399 U.S. 906 (1970); *Quarterman v. Byrd*, 453 F.2d 54 (4th Cir. 1971). Further, case law authorized prior restraint of content where materials are obscene or inflammatory. *Shanley v. Northeast Ind. Sch. Dist.*, 462 F.2d 960, 971 (5th Cir. 1972). LISD officials believed their implementation of the exceptions to the Equal Access Act conformed to the existing law. [App. at 644, Clemmons Dep. 45:1-25, 46:1-25, 47:1-20; App. at 600-601, Hardin Dep.19:9-25, 20:1-25, 21:1-2]. As such, LISD had neither actual nor constructive knowledge that the policy in question was unconstitutional. Thus, Plaintiffs cannot prove this element.

### 3.    No constitutional violation occurred.

The third *Meadowbriar* element requires that an actual constitutional violation must have occurred. It is well settled law that, when the state establishes a limited open forum, there is no requirement to allow individuals to engage in every type of speech. *See, Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106 (2001). In so doing, the state is allowed to reserve its forum for the discussion of certain topics. *Rosenberger v. Rector and Visitors of Univ. of Virginia*, 515 U.S. 819, 828 (1995).

Accordingly, the Equal Access Act specifically allows the school district to restrict access for the well-being of students and to maintain order and discipline. 20 U.S.C. §4071(F)(2003). The

---

[3] Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260 (1988).

school district has the latitude to "preserve the property under its control for the use to which it is lawfully dedicated." *Greer v. Spock*, 424 U.S. 828, 836 (1976). Further, "control over access to a non-public forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral.[4] *Cornelius v. NAACP Legal Def. and Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985). The facts in this case do not support Plaintiffs' contentions that LISD violated Plaintiffs' constitutional rights.

It is clear from the evidence that LISD involved both the well-being exception and the exception to maintain order and discipline in its application of its limited open forum. There was further no constitutional violation as alleged by Plaintiffs in that Defendants' actions did not result in viewpoint discrimination. These issues are further addressed below.

**(a)  LISD invoked the well-being exception based on sexual content speech and sexual activity.**

Initially, we must address whether LISD and Defendants' actions constituted viewpoint discrimination. In the present case, it did not. The restriction is not viewpoint discriminatory because LISD invoked the well-being exception in response to Texas law, Federal law and LISD policy.

In accordance with both Federal and Texas law, LISD closed its limited open forum to all issues relating to sex and sexual activity for the well-being of its students. This is clearly a permissible exception to the Equal Access Act. At the time of LISD's denial to Plaintiffs, the State of Texas had a law banning sodomy. TEX. PENAL CODE ANN §21.06 (Vernon 2003)[5]. Subsequently,

---

[4]Viewpoint discrimination is defined as "regulation of speech in ways that favor some viewpoints or ideas at the expense of others." City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 804 (1984).

[5]  TEX. PENAL CODE ANN. §21.06 states:

---

on June 26, 2003, the U.S. Supreme Court struck down this statute as being unconstitutional.[6] However, at the time LISD refused to grant access to Plaintiffs for their meetings, and the decisions made the basis of Plaintiffs' claims were determined, such statute was legally controlling.

Notwithstanding the Supreme Court's decision, at the time of the denial, as well as presently, Texas had other special protections regarding sexual contact with children. Under TEX. PENAL CODE, §21.11(a)[7], it is the crime of "indecency with a child" when sexual contact is made with a child by the same or opposite sex. While there is an affirmative defense permitting unforced sexual contact between an actor who is not more than three years older than the victim and is of the opposite sex, there is **no** affirmative defense for sexual contact between an actor and a child of the same sex to

---

(a) A person commits an offense if he engages in deviate sexual intercourse with another individual of the same sex.
(b) An offense under this section is a Class C misdemeanor.

[6] Lawrence v. Texas, 123 S.Ct. 2472 (2003).

[7] Indecency with a child:
Tex. Penal Code Ann. §21.11 states:
(a) A person commits an offense if, with a child younger than 17 years and not the person's spouse, whether the child is of the same or opposite sex, the person:
(1) engages in sexual contact with the child or causes the child to engage in sexual contact; or
(2) with intent to arouse or gratify the sexual desire of any person:
(A) exposes the person's anus or any part of the person's genitals, knowing the child is present; or
(B) causes the child to expose the child's anus or any part of the child's genitals.

---

have sexual contact, no matter the age difference. TEX. PENAL CODE ANN § 21.11(b) (Vernon 2003)[8]. This statute has not been held unconstitutional, and is still legally controlling.

Further, LISD has an abstinence policy in teaching matters of sexual activity and sexual contact. In its abstinence policy, LISD takes the position that there is no such thing as safe sex outside of monogamous relationships. [App. at 521]. LISD's policy precludes a discussion of the sexual activity itself. [App. at 521.] LISD currently takes, and took at the time of the subject of this lawsuit, a neutral position in its application of the policy regarding sexual activity; that being, there should be none. [App. at 521.] LISD allowed no latitude for discretionary decisions or acts that could be made in this regard.

LISD provides for the well-being of the student. In this regard, LISD must encourage students to comply with Texas law by not being in direct contravention of existing laws. Allowing clubs based on sexual activity would be encouraging direct contravention of said laws.[5, 7] The very definition of homosexual[9] and heterosexual[10] is defined by the type of sexual intercourse.

---

[8] (b) It is an affirmative defense to prosecution under this section that the actor:
    (1) was not more than three years older than the victim and of the opposite sex;
    (2) did not use duress, force, or a threat against the victim at the time of the offense; and
    (3) at the time of the offense:
        (A) was not required under Chapter 62, Code of Criminal Procedure, to register for life as a sex offender; or
        (B) was not a person who under Chapter 62 had a reportable conviction or adjudication for an offense under this section.

[9] By definition, "homosexual" is defined as:
    (1) of, relating to, or characterized by a tendency to direct sexual desire towards another of the same sex; and
    (2) of, relating to, or involving sexual intercourse between persons of the same sex.
*Miriam Webster Dictionary (2003)*

[10] By definition, "heterosexual" is defined as:
    (1) of, relating to, or characterized by a tendency to direct sexual desire toward the opposite sex; and

---

Homosexual and heterosexual activities, as well as even sexual contact therein, are clearly precluded by state law.[5, 7] The well-being of the student exception incorporates the requirement that he/she follow the applicable laws.

Additionally, federal law requires public schools' restriction of speech having sexual content. Congress requires school officials to prohibit access to websites which contain any words that have any form of sexual content. *Children's Online Privacy Protection Act of 1998*, 13 U.S.C. §1301, *et seq*. School districts are **required** to place filters for any form of speech with any sexual content on all school district computers to which children have access. **Failure of the school officials to prohibit this activity can result in the loss of federal funding.** *Id.*

Plaintiffs' stated objections and goals presented to LISD, by definition, were in violation of Texas law and in violation of the abstinence policy of LISD. Further, the intended purposes of the group as stated in their letter to the LISD Board dated November 6, 2002, [App. at 674] are "to educate those willing about non-heterosexuals" and "educate willing youth about safe sex, AIDS, hatred, etc." [App. at 674.] The group further stated in its letter, "We will not be the ones making the decisions about their sexuality and we will be working with other organizations, councilors [sic], etc. to provide the best help possible." [App. at  674].

Further, these laws and cases are applicable to the Equal Access Act because of the well-being exception. Federal law applies cases to the Equal Access Act which authorize limiting speech that causes disruption at school-sponsored activities. It is applied under the exception for maintaining order and discipline. Likewise, clearly inappropriate sexual content speech must be applied to the

---

(2) of, relating to, or involving sexual intercourse between individuals of the opposite sex. *Miriam Webster Dictionary (2003)*

Equal Access Act under the well-being exception. LISD and its officials were aware of these laws

and were aware of the obligation to prohibit sexual language and sexual content from school students

throughout LISD. [App. at 641, Clemmons Dep. p. 36:2-17]. This is consistent with their applying

the well-being exception to this case. [App. at 532].

In consideration of the decision to apply the well-being exception, the evidence showed that

Rene Caudillo, the President of GAP Youth/GSA, [App. at 542: Caudillo Dep. 21:1-14], requested

that his group place fliers on the Lubbock High School ("LHS") campus in September 2002. [App.

at 559: Caudillo Dep. 89:16-24]. On the flier, a website was posted. [App. at 593]. Caudillo created

the website, **http://hometown.aol.com/gapcrew/GAPyouth.html**. [App. 1 - 9, App. at 593]. (The

website was available, as reflected in App. 1 and 2 on the date of Caudillo's deposition, September

15, 2003. [App. at 547, Caudillo Dep. 41:23-25]. Caudillo testified that he intended the website

for everyone. [App at 546, 570: Caudillo Dep. 37:16-38:22; 134:5-10]. Caudillo further testified that

one purpose for creating the website was to provide information helpful to students and it was

intended to be fun. [App. at 570: Caudillo Dep. 134:13-18]. Caudillo was responsible for the

information contained on the website. [App. at 570: Caudillo Dep. 134:8-11]. The GAP Youth

website included links available on the website. [App. at 543: Caudillo Dep. 28:9-12]. Initially, the

links were added, including **www.gay.com.** [App at 558, 559, 560, Caudillo Dep. 85:10-15; 92:17;

93:6; App. 3 at 675-689]. The exhibit attached as App. 3 at 675-689 was the same information

available through the GAP Youth webpage when Caudillo first created it. [App. at 561: Caudillo.

97:3-7]. Later, additional links were added to **www.youthresource.com**. [App. at 544: Caudillo

Dep. 32:18-25; App. at 10-511]. The main category of links included Gays, Lesbians, Bisexuals and

Transyouth. [App. at 546: Caudillo Dep. 37:14-20]. The foregoing was available on the GAP Youth website as of January 1, 2003. [App. at 8].

Caudillo testified that the GAP Youth website, when listed on the fliers, initially provided access to **www.gay.com** [App. at 560: Caudillo Dep. 95:19] which included very suggestive topics. For example, "New Sexy Gay Game Pics" [App. at 560: Caudillo Dep. . 95:9, App. at 679]. Another topic, "Favorite Questions," included articles on: 1) "Why am I having erection problems?; 2) How Safe is Oral Sex? ; 3) The Truth About Barebacking; 4) First Time With Anal Sex; 5) Kissing and Mutual Masturbation; 6) How Safe Are Rimming and Fingering?; 7) The Lowdown on Anal Warts." [App. at 560, Caudillo Dep. 96:14-17; App. 3 at 681]. This type of information was available through Caudillo's web page for GAP Youth when it was first created and listed on GAP Youth fliers. [App. 560-561, Caudillo Dep. 96:24- 97:7; App. 683-689].

Information available through the GAP Youth website links available on January 1, 2003, on **www.youthresource.com** include examples of multiple references to sex which specifically talked about sexual activity. [App. at 550: Caudillo Dep. 53:21-25]. By way of example, the information and language discussed in the website regarding sexual activity as indicated by Caudillo's testimony included:

> A: "Safer sex: How?: Condom use."
> Q: Is this page an instructional page on how an individual would use a condom in the act of sex?
> A: Yes...
> A: "Discuss safer sex with your partner."...
> A: "Number 2, Buy latex condoms, not lambskin."...
> A: "Number 3, open condom package. Don't use teeth. Number 4, when penis is erect... Number 5, squeeze tip of condom and place rolled condom on head of penis. Number 6, leave a half inch space at the tip of the condom to collect semen. Number 7, hold tip of condom and

unroll until penis is completely covered. Number 8, after ejaculation, while penis is still erect... Number 9, hold condom at base of penis. Number 10, carefully remove condom without spilling any semen. Number 11, wrap condom in tissue and throw away. Don't flush condom down the toilet. Number 12, use new condom for every act of vaginal, oral, and anal intercourse."

Q:  In your opinion does this discuss sexual activity?

A:  Yes.

Q:  It's pretty clear it does, doesn't it?

A:  Yes.

Q:  In fact, I mean it's very graphic and descriptive about the sexual act itself, is it not?

A:  Putting on the condom, yes.

[App. at 549: Caudillo Dep. 50:7 - 51:11; App. 2 at 49].

Another example of sexual activity endorsed by GSA on the links made available on their website is as follows:

A:  "Unprotected oral sex can put you at high risk for STD infection and may carry a risk of HIV infection. If you're having oral sex, oral contact with a partner's vagina or anus, use a dental dam or another latex barrier, such as an unlubricated condom cut down the middle. A dental dam is a square piece of latex about five inches on each side available at dental and medical supply stores. And since it can be hard to find dental and medical supply stores, you can also use plastic wrap, available at your local grocery store. If you're having oral sex with a guy, be sure to use an unlubricated condom."...

A:  **"Asking my partner to put on a glove is very erotic. I'm expressing my desire for her to touch me. Safe sex is a turn on. ... If you're sharing a sex toy with your partner such as a dildo make sure to put a condom on the toy, and change condoms in between partners. Or if you have a toy made of silicone, you can boil it for three minutes to sterilize it in between partners."**

[App. at 549, Caudillo Dep. 51:25 - 52:24; App. 2 at 50-51].

Further, the group also endorsed heterosexual sex:

A:      "Safer sex: How?"...
A:      "Vagina/penis intercourse, inserting a penis" – ...
A:      – "into a vagina. Anal intercourse is inserting a penis into an anus.
        Oral sex, touching someone's vagina or penis with the mouth.
        Oral/anal sex, touching someone's anus with the mouth. Manual sex,
        using your hands. Sharing a sex toy." ...
Q:      And once again, that information would be information that'd be
        accessible through the links that are available on your Web site; is
        that correct?
A:      Yes.
Q:      And once again, this is very explicit and detailed on in this case the
        hows of sexual activity; is that correct?
A:      Yes.

[App. at 550: Caudillo Dep. 54:5 - 55:2; App. 2 at 50-51].

Drug use is also advocated on the website, as indicated by Caudillo deposition testimony:

A:      But if you decide to shoot up, make sure you don't share needles and
        use a sterile needle every time.

[App. at 550, Caudillo Dep. 53:14-15].

Unbelievably, this explicit information is available to all children who enter the GAP Youth

website, no matter the age. However, even more explicit information was available through the GAP

Youth website link for all of those over the age of 13, by way of belonging to "RingSurgNet Ring"

or "Ringmaster." [App. at 550: Caudillo Dep. 55:11-18; App. 2 at 195].

In applying to post the GAP Youth fliers, Caudillo and others met with Hardin. In Caudillo's

meeting with Hardin, Caudillo testified that Hardin said he had looked over the website. [App. at

559: Caudillo Dep. 92:7-12]. Caudillo referred to the contents of  the website linking to

**www.gay.com.** [App. at 559: Caudillo Dep. 92:21-24], which he admitted was inappropriate. [App.

at 559, Caudillo Dep. 92:13-15].



According to Caudillo, the **Gay.Com** link was removed from its website at some time after requesting permission to place GAP Youth fliers. [App. at 562, Caudillo Dep. 102:13-14]. However, the **youthresource.com** link was on the GAP Youth website when Hardin reviewed the website in January 2003 before making his decision denying GAP Youth recognition and informing the group of same. [App. at 601, 614: Hardin Dep. 23:15 and 74:2; App. 1 at 8]. Sexual content and sexual activity continued to be on the website links promulgated by GAP Youth at the first request to place fliers and the final request for access. [App. at 612-614, Hardin Dep. 67:2-25, 68:1-25, 69:1-2, 72:11-25, 73:12-25, 74:1-2].

The purposes of GAP Youth clearly were based on sex and sexual activity. Even if the website was removed, the sexual basis upon which it was formed could not be separated from the group itself, for its purpose was to discuss heterosexuality and homosexuality, which by definition[9].[10] all are based on sexual activity. The group's purpose included a discussion of safe sex. [App. at 718]. Further, the group intended to provide website links regarding safe sex, which is sexual activity as evidenced on the GAP Youth website and stated purposes, [App. 1 at 1-9 and App. 2 at 10 - 511; App. at 718.] which was against LISD's abstinence policy. [App. at 521].

Hardin informed Clemmons that he had reviewed the flier and information on the website which was indicated on the flier. Hardin informed Clemmons of the sexual content of the website. [App. at 637, Clemmons Dep. 18:1- 20:11]. Clemmons was aware that the essential promoted activity underlying the group's formation would be in violation of state law based upon the stated goals of the organization, which included "educate those willing about non-heterosexuals" and "educate willing youth about safe sex." [App. at 638. 638: Clemmons Dep. 17:18 - 18:25, 20:25-

21:13]. Further, Clemmons testified, "I am stating that our concern was that by having students meet with this group and having access to the website links that we were aware of is that they reviewed safe sex information and encouraged them to participate in activities that was against state law and LISD policy." [App. at 637, Clemmons Dep. 19:6-10].

Clearly, LISD did not violate the Equal Access Act. The Act provides school officials the authority to review the application of the group to see if it falls into one of the Equal Access Act's exceptions, which are: 1) maintain order and discipline; 2) the well-being of the student and faculty; and 3) attendance.[11] LISD routinely reviews the applicant's purposes and information they present to determine whether an exception applies. [App. at 599, Hardin Dep. 13:24-25, 14:1-9]. It is clear that the statutory exception for the well-being of the student applies in this case. Similarly, the U.S. Supreme Court has allowed restriction of material with sexual content to minors in *Ginsberg v. State of New York*[12]. The material was patently offensive according "to prevailing standards in the adult community as a whole with respect to what is suitable material for minors" and [was] utterly without redeeming social importance for minors." *Id* at 638. Likewise, the material in the websites available through Plaintiffs' websites were, indeed, not suitable for children. In no way did Congress intend to prohibit school officials from controlling access of clubs to its school when it is against federal law, state law, school policy, and when the activities involve promoting sexual activity for children from age 12 to 17. Such activity is clearly not in the best interest of the children and is contrary to the well-being of children.

---

[11] Equal Access Act, 20 U.S.C. § 4071(f).

[12] Ginsberg v. State of New York, 390 U.S. 629 (1968).

Therefore, LISD did not deprive Plaintiffs of a statutory right because it legitimately, with authority, implemented the well-being exception to the Equal Access Act. Not only was it LISD's right to do so, but it was also LISD's duty and obligation to do so.

> **(b)** **In light of the purpose served by the forum, the well-being exception is invoked because of the constitutionally permissible distinctions between children and adults.**

Clearly, the law is well-established that children's constitutional rights do not always equate to the constitutional rights of adults. In *Bellotti v. Baird*, 443 U.S. 622, 634 (1979), the U.S. Supreme Court established a three-prong test to determine when the constitutional rights of children do not equate to the constitutional rights of adults. Under the *Bellotti* analysis, one must prove 1) a peculiar vulnerability of minors, 2) a minor's inability to make critical decisions in an informed, mature manner, and 3) the importance of the parental role in child-rearing. *Id.* This test has been applied to many legal restrictions for minors under both state and federal law.

In that regard, the courts have made multiple distinctions between the constitutional rights of children and of adults. School children are subject to less stringent requirements for searches than adults. *Shoemaker v. State*, 971 S.W.2d 178 (Tex. App. - Beaumont 1998). School children are also subject to dress codes if the local school board adopts a policy concerning the same. *Bastrop ISD v. Toungate*, 958 S.W.2d 365 (Tex. 1997). Moreover, school children are subject to drug testing for any extra-curricular activities in order to allow for participation in said activity. *Bd. of Educ. v. Earls*, 536 U.S. 822 (2002). It is clear that distinctions between children and adults are often proper when said decisions/policies are made with the well-being of the child's interests in mind.

Likewise, the State of Texas places restrictions on children which are not applicable to adults: operation of a motor vehicle, TEX. TRANSP. CODE ANN. § 729.001 ( Vernon 2003); legal right to consume alcohol, TEX. ALCO. BEV. CODE ANN. §§ 106.01-02 (Vernon 2003); access to weapons, TEX. PENAL CODE ANN. § 46.13 (Vernon 2003); no participation in gang membership, TEX. PENAL CODE ANN. § 22.015, 71.02 (Vernon 2003); children are placed under curfews, TEX. LOCAL GOVT CODE ANN § 351.903 (Vernon 2003); *Qutb v. Strauss*, 11 F.3d 488, cert. den. 511 U.S. 1127 (1994) (holding that curfew for minors did not violate plaintiffs constitutional rights to association under the United States or Texas Constitution since the state had a compelling interest) and as previously mentioned in depth, restrictions on sexual contact with a child and between children. TEX. PENAL CODE ANN. § 21.11 (Vernon 2003).[5, 7] Further, greater provisions are made for the physical and mental health, safety and protection of minors in the Texas Family Code. TEX. FAM. CODE ANN. § 262.001 (Vernon 2003).

These types of laws reflect the state's "general interest in the youth's well-being." *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944). Governmental entities have a "strong interest in fostering the welfare of children and protecting the youngest members of society from harm is well-established." *Schleifer v. City of Charlottesville*, 159 F.3d 843, 848 (4th Cir. 1998), cert den. 526 U.S. 1018 (1999).

The Equal Access Act's limited open forum is applicable to both public schools and schools of higher education. However, the appropriate latitude given to such access between the two entities can be easily distinguished. University students are adults. University students, being of legal age, have the legal right to make decisions regarding their own sexual activity amongst themselves

without fear of criminal penalties. In comparison, 12 through 17 year olds do not. TEX. PENAL CODE ANN. §21.11 (Vernon 2003).[5,7] University students are, for the most part, living independently from their parents. The university does not serve *in loco parentis* (in place of the parents). To the contrary, public school students are children who normally live with their parents, the parents exercise parental control, and the school itself serves *in loco parentis. Bd. of Educ. v. Pico*, 457 U.S. 853, 871-72 (1982). Cases recognize the obvious concern on the part of parents and school authorities acting *in loco parentis* to protect children. *See Ginsberg v. New York*, 390 U.S. 629 (1968) (upholding a New York statute banning the sale of sexually oriented material to minors, even though the material, which was questioned, was entitled to First Amendment protection with respect to adults); *Pico*, 457 U.S. at 871-72 (authority of public schools to remove books that are vulgar from a public school library where the books could be placed in a public library for adults). "The constitutional rights of students in public school are not automatically co-extensive with the rights of adults in other settings." *Bethel Sch. Dist. v. Fraser.*, 436 F.2d 675, 682 (1986). Even though the First Amendment guarantees wide freedom in matters of adult speech, it does not follow that the same latitude must be permitted to children in a public school. *New Jersey v. T.L.O.*, 469 U.S. 325, 340-342 (1985). A balancing test must be placed for the freedom of speech against society's countervailing interest in teaching students the boundaries of socially appropriate behavior as established by the school board. *Bethel Sch. Dist.* 478 U.S. at 681.

By applying the *Bellotti* standard to the application of the well-being exception to the Equal Access Act, it is evident that LISD officials had the authority to regulate the children's right of access.

First, children are particularly vulnerable during their formative years to issues of sex. This is evidenced by the U.S. Congress passing the *Children's Online Privacy Protection Act of 1998*, 13 U.S.C. § 1301, *et seq*. Impressionable children think they are "bullet proof" and experiment with a variety of activities which can have life-long consequences. Thus, the purpose of exerting the well-being exception is to protect children from potential harms presented by early sexual activity.

Second, children's rights should not be equated to adults because children are unable to make critical decisions in an informed, mature manner. Children, unlike adults, often lack the experience and perspective to recognize and respond to choices that could be harmful to them.

Third, children's rights are not equated to those of adults because of the importance of the parental role in child rearing. Parents nurture the social mores, personal values and emotional character of children. Parents should be seriously involved in their children's sexual development. The school clubs under the LISD limited open forum do not include parents. In fact, the parents may not even know their children have obtained membership in the club. Therefore, the well-being exception implementation assists parents in the responsibility of parental supervision. *Schleifer*, 159 F.3d at 848.

The Equal Access Act's limited open forum applies to children as young as 12 years of age (seventh grade). Introducing matters of sex and sexual activity at such a young, tender age is not an appropriate forum. Allowing a group to organize to talk about matters of sexual activity, whether homosexual or heterosexual, is inappropriate. Therefore, since the *Bellotti* standard is met, LISD has additional authority to invoke the well-being exception to the Equal Access Act.

Further, permitting access to clubs which discuss sex, sexual activity and sexuality could lead to requests for access by other clubs dealing with other sexual matter, such as the Hip Heterosexual Sex Club, the Beastiality Club, the Prostitute Club, and the Gigilo Club. Likewise, any club based on an illegal act could claim access to public schools, such as the Marijuana Club, Kids for Cocaine, and Drinking Clubs. By not allowing access for clubs based on sexual and/or illegal conduct, LISD is protecting its students. LISD should be able to deny access to these groups based on state law, federal law, Board policy and the well-being of the students. Public schools must have the latitude to deny access under the Equal Access Act to groups which do not comply with compelling interests of the state, as well as state laws.

As a result of the difference in maturity and rights of college students and the young, the Supreme Court has affirmed that it is a "distinction [that] warrants a difference in constitutional results." *Edwards v. Aguillard*, 482 U.S. 578, 584 (1987) (quoting *Abington Sch. Dist. v. Schempp*, 374 U.S. 203, 253 (1963) (Brennan, J., concurring); *Bethel Sch. Dist.* at 685 (1986) (holding that the First Amendment does not prevent school officials from determining vulgar and lewd speech should not be permitted as it would undermine the school's basic educational mission).

As Justice Black, in his dissenting opinion in *Tinker v. Des Moines Ind. Cmty. Sch. Dist.*, 393 U.S. 503 (1969), and affirmed in *Bethel Sch. Dist.*, stated:

> "I wish, therefore, . . . to disclaim any purpose . . . to hold that the Federal Constitution compels the teachers, parents, and elected school officials to surrender control of the American public school system to public school students."

*Tinker*, 393 U.S. at 526. Therefore, restricting access to Plaintiffs under the well-being exception is an appropriate action.

In essence, it is clear that LISD did not exclude Plaintiffs from access pursuant to the Equal Access Act based on viewpoint discrimination, rather, it was based on State law, Federal law and the neutral LISD abstinence policy concerning these sensitive subjects. LISD had the authority to exclude the group based on the well-being exception to the Equal Access Act as the distinction between children compared to adults warrants a difference in application. *Edwards*, 482 U.S. at 584 n.5. Thus, LISD had no constitutional violation and Plaintiffs cannot prove this § 1983 element.

    **(c)**    **There is no viewpoint discrimination and the Equal Access Act is not violated when invoking the exception for maintaining order and discipline.**

LISD also invoked the exception to the Equal Access Act of maintaining order and discipline. Under Title IX, 20 U.S.C. § 1681(a) (2003), LISD is liable when it acts with deliberate indifference to known acts of harassment in its programs or activities. *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 641 (1999). The United States Department of Education's Office of Civil Rights (OCR) gave its opinion and stated:

> "Although Title IX does not prohibit discrimination on the basis of sexual orientation, sexual harassment directed at gay or lesbian students that is sufficiently serious constitute sexual harassment prohibited by Title IX. Further, gender-based harassment is also a form of sex discrimination. Revised Sexual Harassment Guidance: Harassment of Student by School Employees, other Students or Third Parties. OCR, 1/16/2001."

A potential for this type of harassment due to meetings being held at the school could lead to a disruptive and potentially dangerous and harassing incident to said students, which thus requires LISD to maintain order. [App. at 672].

LISD officials were concerned with the potential of material and substantial disruption that may accompany the exercise of Plaintiffs' expression. This concern was a "reasonable forecast" of disruption. The Fifth Circuit has held that "it is not necessary that the school administration stay a reasonable exercise of restraint 'until disruption actually occur[s].'" *Butts*, 436 F.2d at 731. There is no constitutional requirement for a specific rule regarding the extent of student conduct before the school administration may act reasonably to prevent disruption. *Eisner v. Stamford Bd. of Educ.*, 440 F.2d 803 (2nd Cir. 1971); *Richards v. Thurston*, 424 F.2d 1281 (1st Cir. 1967). Further, reasonable prior restraint of content is allowed for those materials which are obscene or inflammatory. *Shanley*, 462 F.2d at 971.

In this regard, LISD reasonably forecasted disruption. Clemmons testified as follows:

Q:    How in your opinion would allowing GAP Youth to meet on campus have caused a problem with maintaining order?

A:    After having visited with campus administration, central office administration, taken into consideration the fact that there were a lot of administrative years of experience information to me and having taken some telephone calls from concerned parents, anonymous telephone calls in central office, it was my feeling that there might be disruption if we allowed the GAP Youth to meet. Some parents called, and I don't know whether they were pro-GAP Youth or anti-GAP Youth, but they expressed concerns on the telephone about those students and their safety.

Q:    Please express the specific content, as best you recall to those anonymous calls?

A:    I just know a secretary would come to me and say, "Dr. Clemmons, we got another call while ago or we received a call this morning from someone that was quite concerned about what might happen if these GAP Youth get to meet."

[App. at 644, Clemmons Dep. 45:17 - 46:9].

A:    ...
      that those type calls occurred. I do know I visited with campus principals that had many years of experience under their belt and asked them their opinion as to whether or not they felt a safety concern would be there if these youth met and the principals that I met with stated that yes, they were quite concerned about this.

Q:    Whose safety would they be concerned with?

A:  They were concerned about the safety of all students. But thinking that if the GAP Youth met that the safety of those students would be in question as well as the safety of the others that might get involved in some kind of confrontation.

Q:  Who might get involved in some kind of confrontation?

...

Q:  Not a specific name but -

A:  Don't know any names but just know that the information that came back to me was that there might be students on campuses that would harass them and it was a concern of mine.

[App. at 644, Clemmons Dep. 46:19 - 47:12].

Q:  In order to avoid that eventuality you would not allow them to meet or advertise on campus, correct?

...

A:  That was part of the basis for the decision to not allow them to advertise or meet on campus.

Q:  Why in this case would you deny rights - strike that.
     Why in this case would you not intercede with the potential harassers as opposed to the potential harassment victims?

A:  Not knowing who the potential harassers were would keep us from interceding in that. If we knew who the potential harassers were, we would definitely would have. Your analogy while ago about a funny looking kid and someone picking on the funny looking kid, we had a victim and we had someone committing a crime or a harassment. In that situation, it's easy to handle. In the situation where you don't know who it's going to be, it's much more difficult to handle. So part of the job of superintendent is to be proactive and try to avoid or head off concerns when you know that there might be some.

Q:  So is it your opinion that you can block access to campus of any politically unpopular group that might be subject to threats of harassment based on their views?

...

A:  It is my opinion that the federal government through the Equal Access Act has given exceptions which make a school administrator review those exceptions to see if there's a concern.

[App. at 644, Clemmons Dep. 47:21-48:24].

Hardin further testified regarding potential disruption, to-wit:

Q:  Okay. So at that time, what did you base your decision on if it wasn't facts leading you to believe that official recognition of the group would cause a disruption of order on campus?

A:     Will you state the question again:

Q:     Yes. If, as you've just said previously that you knew of no facts at that time when you made your decision that offering official recognition to the group would have caused a disruption of order, how was it that you came to your conclusion that that would have been the case, as you stated in your affidavit, that offering official recognition to the group would have caused a disruption of order?

A:     I think we had a concern based on again the content of the Web site, and also I believe Ricky Waite had testified that he had encountered some issues where at the time that I made the decision I was not aware of that.

Q:     Could you be more specific about the issues that Ricky Waite encountered?

...

A:     Name calling, things of that nature. And I'm working off my memory from a year ago.

Q:     Are there any other facts that would have led you to believe that offering official recognition to the group would have caused a disruption of order other than the testimony given by Ricky Waite about name calling?

A:     Again, I know that there were discussions about phone calls that had been received in Dr. Clemmons' office about a concern for the safety.

[App. at 602, Hardin Dep. 25:8-26:10].

Q:     So whether or not the group actually met on campus or not would have had nothing to do with the fact that Ricky Waite was called names in the past?

...

A:     It would have nothing to do with whether he had been called names in the past. But I think as administrators we look to be proactive.

[App. at 602, Hardin Dep. 27:11-17].

Additionally, LISD had the right to exercise reasonable prior restraint of content to those materials which, as viewed on the website, were obscene and inflammatory as it was reasonably foreseeable in their judgment. The *Shanley* court held that "the school board's burden of demonstrating reasonableness becomes geometrically heavier as its decision begins to focus upon the content of materials that are not obscene, libelous or inflammatory." *Shanley*, 462 F.2d at 971. In this case, the school board's burden of demonstrating reasonableness is not heavy as the content

of the materials on the website were clearly obscene in view of the age of the students who were led

to these website links by virtue of the fliers.

Therefore, LISD officials exercised reasonableness in their forecast of disruption that might

result from the exercise of expression, and properly invoked the exception for maintaining order and

discipline under the Equal Access Act. Further, LISD did not violate Plaintiffs' constitutional or

statutory rights and Plaintiffs cannot prove this § 1983 element.

4. **The custom or policy did not serve as the moving force behind the violation, if any, because LISD did not act with deliberate indifference to Plaintiffs' constitutional or statutory rights.**

Section 1983 provides a remedy to a plaintiff only if the policymakers acted with deliberate

indifference to the constitutional or statutory rights of Plaintiffs. *City of Canton v. Harris*, 489 U.S.

378, 389 (1989). The U.S. Circuit Courts have uniformly interpreted *Canton's* "deliberate

indifference" requirement in cases involving facially constitutional policies. The Ninth Circuit held

> The existence of a policy, without more, is insufficient to trigger local government liability under § 1983. Under *City of Canton*, before a local government entity may be held liable for failing to act to preserve a constitutional right, plaintiff must demonstrate that the official policy "evidences a 'deliberate indifference'" to its constitutional rights.

*Oviatt v. Pearce*, 954 F.2d 1470, 1477 (9th Cir. 1992) (quoting *Canton*, 489 U.S. at 389). *Benavides*

*v. County of Wilson*, 955 F.2d 968, 972-75 (5th Cir. 1989) cert den. 101 S.Ct. 2617 (1990) (before

holding a city liable for a policymakers mistake in personnel decisions § 1983 required a showing

of deliberate indifference).

> Neither the language nor the legislative history of § 1983 indicates that Congress intended to prove remedies for negligent acts, I would hold that one who does not

intend to cause and does not exhibit deliberate indifference to the risk of causing the harm that gives rise to a constitutional claim is not liable for damages under § 1983."

*Procunier v. Navarette*, 434 U.S. 555, 568 (1978) (Berger, C.J., dissenting). "Further, negligence and gross negligence do not give rise to § 1983 liability." *Medina v. Denver*, 960 F.2d 1493, 1500 (10th Cir. 1992). A school district may be held liable only if the board of trustees' decision manifested a deliberate indifference to the welfare of school children. *Gonzalez v. Ysleta Ind. Sch. Dist.*, 996 F.2d 745, 760 (5th Cir. 1993). The Fifth Circuit further held in *Gonzalez* that

> Inadequate, but constitutional policies and decisions rise to the same action plane as the unconstitutional policies considered in *Monell, Owen[13], Newport[14]* and *Pembaur* only if a showing that they were enacted or made with deliberate indifference to their possible unconstitutional consequences.

*Id.* at 759.

In applying the law to the facts of this case, it is clear that there is no evidence that the LISD policymakers acted with deliberate indifference to the constitutional rights of the Plaintiffs so as to find the policymakers intentionally chose to ignore those rights. To the contrary, there is substantial evidence that LISD adopted policies that were constitutional and protected student's rights. [App. at 719]. Further, LISD carefully applied the Equal Access Act and its exceptions to Plaintiffs. First, LISD considered the application of Plaintiffs and reviewed its purposes. [App. at 719; App. at 593; App. at 598, 599, Hardin Dep 12:24-13:10]. Second, the flier that was presented included a website which Hardin and Vogler reviewed. [App. at 1-511; App. at 598, 599, Hardin Dep. 12:24-13:10; App. at 559, Caudillo Dep. 92:7-12; App. at 593]. Third, Hardin met with the student applicants and

---

[13] *Owen v. Independence*, 445 U.S. 622 (1980).

[14] *Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981).

their parents. [App. at 559, Caudillo Dep.90:3-5, 92_7-12]. Fourth, as indicated hereinabove, the website showed inappropriate material which had a sexual content and described sexual activity. [App. at 1-511; App. at 612, 613, Hardin Dep. 67:18; 70:4]. Fifth, Hardin and Clemmons were aware of the LISD Abstinence Policy. [App. at 528; App at 670]. Sixth, Hardin and Clemmons were aware of the *Children's Online Privacy Protection Act of 1998* which required the school district to place filters on its computers for speech with a sexual content. [App. at 599, Hardin Dep. 13:11-14; App. at 641, Clemmons Dep. 36:2-6]. Seventh, Hardin and Clemmons were both aware of state law which prohibited sex with minors. [ App. at 527; App. at 669-670]. Eighth, Hardin and Clemmons were both aware of issues regarding harassment and potential disruption by means of telephone calls and visiting with school administrators. [App. at 602, Hardin Dep. 25:8 - 26:10; App. at 644, Clemmons Dep. 46:9- - 47:12, 47:21 - 48:21, 45:17 - 46:9]. Finally, Clemmons and Hardin based their decisions on the above and believed that they were well within the exceptions to the Equal Access Act of the well-being and maintaining order and discipline exceptions to the Equal Access Act. [App. at 527; App. at 669].

Thus, LISD did not act with deliberate indifference to the constitutional or statutory rights of Plaintiffs. To the contrary, they carefully assessed the situation, applied the facts to the Equal Access Act and its Board policy, the abstinence policy, state and federal law, GAP Youth's purposes and its website with links in order not to violate any of Plaintiffs' constitutional or statutory rights.

In the alternative, assuming arguments that LISD made the wrong decision, it was a negligent decision which is not actionable under § 1983. *Medina,* 960 F.2d at 1500 .

5.    **Summary**

Plaintiffs cannot prove each and every element set forth in the *Meadowbriar* test in order to attach liability to LISD, Havens and Hardin under § 1983. Therefore, Plaintiffs' claims must fail and LISD, Havens and Hardin should be granted summary judgment for Plaintiffs' claims of violation of the Equal Access Act, § 1983 - § 1988 and for Declaratory Relief pursuant to 28 U.S.C. §§ 2201-02.

**C.    Issue of Law No. 2.    LISD, Havens and Hardin are entitled to summary judgment as a matter of law since LISD has no policy or custom of abridging Plaintiffs' freedom of speech and association by denying access to a limited public forum on the basis of content and viewpoint of their speech.**

The policy regarding freedom of expression is LISD Board Policy FNA (LEGAL), to-wit:

"The District shall take no action respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Board for a redress of grievances. *U.S. Const. Amend. I*

"Students do not shed their constitutional rights to freedom of speech or expression at the schoolhouse gate. At school and school events, students have First Amendment rights, applied in light of the special characteristics of the school environment.

"Student expression that is protected by the First Amendment may not be prohibited absent a showing that the expression will materially and substantially interfere with the operation of the school or the rights of others.

"*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 89 S.Ct. 733 (1969) [See also FNCI]

"The inculcation of fundamental values necessary to the maintenance of a democratic society is part of the work of the school. The First Amendment does not prevent school officials from determining that particular student expression is vulgar and lewd, and therefore contrary to the school's basic educational mission. *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 106 S.Ct. 3159 (1986).

[App. at 719]

In order to attach liability to LISD, Havens and Hardin, Plaintiffs again must meet the *Meadowbriar* elements necessary to prove a § 1983 violation. (*See supra* Issue of Law #1 incorporated herein by reference as if copied in full.)

**1.    The LISD policy or custom is constitutional and the policymakers knew of no unconstitutional policy or custom.**

LISD's policy is constitutional. The U.S. Supreme Court has allowed regulation of student speech based on material and substantial disruption, *Tinker*, 393 U.S. at 503, and vulgar and lewd speech. *Bethel Sch. Dist.* 478 U.S. at 675. There is no violation of one's freedom of speech or association when there is a legitimate need for regulation of the speech.

In prior instances, the U.S. Supreme Court has discussed the content of students' speech. The *Tinker* case involved several public school students who wore armbands to school which signified their opposition to the war in Vietnam. *Tinker,* 393 U.S. at 504. The school had a rule banning armbands. *Id.* In this instance, the Supreme Court found an infringement of the students' constitutional right of free speech. However, the Court did not adopt an "anything goes" viewpoint. The Court emphasized that student expression in or out of class that "materially disrupts classwork or involves substantial disorder or invasion of the rights of others, is, of course, not immunized by the constitutional guarantee of freedom of speech." *Id.* It is important to note that the *Tinker* case involved symbolic expression, which was meaningful to the students.

To the contrary, the U.S. Supreme Court ruled that expression with regard to sex is not entitled to constitutional protection. In *Bethel Sch. Dist.*, the Court found that a senior who used sexual innuendoes in a nominating speech during a voluntary school assembly for electing student body officers and who was subsequently suspended from school as a result, had no violation of his

right to freedom of speech when he was suspended. *Bethel Sch. Dist.* 478 U.S. at 675. The Court upheld the sanctions against the *Fraser* student, noting that the school has an interest in having students express themselves in an acceptable manner. *Id.* Just as the Supreme Court held that sexually explicit speech in an educational setting was not protected in *Bethel Sch. Dist.*, this Court should likewise find the same in this case. *Id.*

Thereafter, in 1988, the U.S. Supreme Court continued and broadened its view on this matter when it ruled in *Hazelwood Sch. Dist.,* 484 U.S. at 260, that school districts have broad censorship power over school newspapers where the offensive language was sexual in nature. The reasonableness of the individual school administrator's decision of appropriateness was supported by the fact that such "content" could be censored in the manner the school so acted. *Id.* at 569. The Court extended this control and censorship to "other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school." *Id* at 569.

Even though these cases apply to the school-sponsored setting, they still are applicable to the Equal Access Act in a public school limited open forum. Clearly, speech can be regulated in order to maintain order and discipline. Limits on student speech for disruptive conduct in the classroom or for school-sponsored events include, but are not limited to, forcing buttons on unwilling students[15], throwing buttons through windows[16], interfering with students trying to get to class [17],

---

[15] Blackwell v. Issaquena County Bd. of Edu., 363 F.2d 749, 7553 (5th Cir. 1966).

[16] *Id.*

[17] Clark v. Dallas ISD, 806 F.Supp. 116, 121 (N.D. Tex. 1992).

gathering large crowds[18], and using bullhorns[19]. These regulations are also invoked under the exceptions to the Equal Access Act for maintaining order and discipline when the students are on the school campus.

Likewise, school districts have the authority to limit speech with sexual content in the classroom and at school-sponsored events which include sexually explicit speech in a nominating speech[20] and sexually offensive language in a school newspaper[21]. Therefore, this regulation is also permissible under another exception to the Equal Access Act - the well-being of the student when the student is on the school campus. Just as the present case involves minors in public school, both of the cases above were limited to the public school setting and did not apply to a university setting; thus greater control/censorship was held to be constitutional. Therefore, LISD did not exercise viewpoint discrimination and, in light of the forum, reasonably and properly chose to deny access on the basis of the exceptions of maintaining order and the well-being of the students.

**2. Regardless of Plaintiffs' claims, no constitutional violation occurred.**

> **(a) Defendant did not violate Plaintiffs' First Amendment right of speech and association since there was a compelling state interest.**

The First Amendment to the United States Constitution provides for freedom of speech, as well as freedom of association. These rights to associate for expressive purposes and for freedom of speech are not absolute. The right may be infringed upon when justification is to serve a

---

[18] *Id.*

[19] *Id.*

[20] *Bethel Sch. Dist.* 478 U.S. at 675.

[21] *Hazelwood, 484 U.S. 260 (1988)*

compelling state interest. *See, Roberts v. United States Jaycees*, 468 U.S. 609, 623 (1984). In

*Roberts*, the United States Jaycees attempted to pull the charters of two of its chapters because

women were allowed to participate as members. The Court found that there was a compelling

interest of the state in eradicating discrimination against its female citizens. Therefore, that interest

justified its overriding the male members' associational freedoms. *Id.*

Likewise, the Court found a compelling state interest in deterring drug use in the public

schools. *Vernonia Sch. Dist. v. Acton*, 515 U.S. 646 (1995). Vernonia School Districts' drug testing

policy was found to be valid even though it violated the Fourth Amendment. The United States

Supreme Court held that student athletes were not entitled to full Fourth Amendment protections

regarding U.S. Constitutional Amendments with regard to being required to submit to suspicionless

drug testing on the basis that the state's interest in preventing drug addiction among students was

compelling. The Court discussed the true immediacy and nature of a governmental issue. *Vernonia*

*Sch. Dist.,* 515 U.S. at 661. The Court defined a compelling interest as one that "appeared important

enough to justify the particular search in light of other factors." *Id.* The Court found that the nature

of the concern was compelling because deterring drug use by our school children is of utmost

concern. *Id.* The Court also found that a child's school years were a time when the "physical,

psychological and addictive effects of drugs are most severe." *Id.* They compared children to adults

and found that they had nervous systems that were more critically impaired than adults; childhood

losses in learning were lifelong and profound and that children can become more chemically

dependent quicker than adults. *Id.*

*Vernonia* was expanded to include those participating in all extracurricular activities in *Earls* at 882. Again, a compelling interest was found in protecting the students' safety and health since drug use was an important governmental concern. *Id.* at 827.

Just as protection from illegal drug use is a compelling state interest, likewise, there is a compelling state interest in preventing groups based on sex, sexual content and sexual activity from gaining access and recognition at a public secondary school. LISD's compelling state interest and that of any other school district is for the health and well-being of the children. It is of utmost importance to protect the students' mental health and physical well-being resulting from teen pregnancy, sexually transmitted diseases and removal from the educational setting as a result. Discouraging sexual activity of minors clearly meets the compelling interest test.

Constitutional freedoms are not co-existent with the rights of adults in other settings. *Bethel Sch. Dist.*, 478 U.S. at 682. Thus, the balancing test must be invoked to determine whether the freedom of speech and association outweighs society's countervailing interest in teaching students the boundaries of socially appropriate behavior. *Id* at 681. Applying the balancing test to the facts at hand, it is clear that LISD did not violate Plaintiffs' constitutional rights as LISD has a compelling state interest to protect the health of the school children and to discourage sexual activity of the children, especially that which is illegal. This compelling interest overrides Plaintiffs' free speech and association rights as the Federal Constitution does not compel school officials " to surrender control of the American public school system to public school students." *Bethel Sch. Dist.,* 478 U.S. at 526.

**(b)** **There is no viewpoint discrimination and the Equal Access Act is not violated when invoking the exception for maintaining order and discipline.**

Defendant also invoked the exception to the Equal Access Act of maintaining order and discipline. Under Title IX, 20 U.S.C. § 1681(a) (2003), the District is liable when it acts with deliberate indifference to known acts of harassment in its programs or activities. *Davis*, 526 U.S. at 629. The United States Department of Education's Office of Civil Rights (OCR) gave its opinion and stated: "Although Title IX does not prohibit discrimination on the basis of sexual orientation, sexual harassment directed at gay or lesbian students that is sufficiently serious constitute sexual harassment prohibited by Title IX. Further, gender-based harassment is also a form of sex discrimination. Revised Sexual Harassment Guidance: Harassment of Student by School Employees, other Students or Third Parties. OCR, 1/16/2001." A potential for this type of harassment due to meetings being held at the school could lead to a disruptive and potentially dangerous and harassing incident to said students, which thus requires LISD to maintain order. [App. at 639, Clemmons Dep. 25:13-25, 26:1-10].

LISD officials were concerned with the potential of material and substantial disruption that may accompany the exercise of Plaintiffs' expression. This concern was a "reasonable forecast" of disruption. The Fifth Circuit has held that "it is not necessary that the school administration stay a reasonable exercise of restraint 'until disruption actually occur[s].'" *Butts*, 436 F.2d at 731. There is no constitutional requirement for a specific rule regarding the extent of student conduct before school administration may act reasonably to prevent disruption. *Eisner,* 440 F.2d at 803; *Richards*,

424 F.2d at 1281. Reasonable prior restraint of content is allowed for those materials which are obscene or inflammatory. *Shanley*, 462 F.2d at 971.

In that regard, LISD officials reasonably forecasted disruption. Clemmons and Hardin testified as such as indicated in Section B.3.(c) hereinabove which is incorporated herein by reference as if copied in full.

Therefore, LISD officials exercised reasonableness in their forecast of disruption that might result from the exercise of expression and invoked the exception for maintaining order and discipline under the Equal Access Act.

Additionally, LISD had the right to exercise reasonable prior restraint of content to those materials which, as viewed on the website, were obscene in its reasonable judgment.

Therefore, summary judgment should be granted to LISD, Havens and Hardin on the basis that LISD had no policy or custom of abridging Plaintiffs' freedom of speech and association by denying Plaintiffs access to a limited public forum.

**3. No LISD custom or policy served as the moving force behind any violation, if any, because LISD did not act with deliberate indifference to Plaintiffs' constitutional rights.**

LISD, Havens and Hardin incorporate all arguments previously presented herein above, as if copied in full. LISD, Havens and Hardin did not violate Plaintiffs' constitutional or state rights; thus, their actions were not a moving force behind any violation.

Section 1983 provides a remedy only if official policy evidences a deliberate indifference to the constitutional or statutory rights of Plaintiffs. *City of Canton,*, 489 U.S. at 389 (1989). The U.S.

Circuit Courts have uniformly interpreted *Canton's* "deliberate indifference" requirement in cases

involving facially constitutional policies. The Ninth Circuit held,

> The existence of a policy, without more, is insufficient to trigger local government
> liability under § 1983. Under *City of Canton*, before a local government entity may
> be held liable for failing to act to preserve a constitutional right, plaintiff must
> demonstrate that the official policy "evidences a 'deliberate indifference'" to its
> constitutional rights.

*Oviatt, 954 F.2d at* 477 (quoting *Canton*, 489 U.S. at 389), *Benavides,* 955 F.2d at 972-75 (before

holding a city liable for a policymakers mistake in personnel decisions § 1983 required a showing

of deliberate indifference). "Neither the language nor the legislative history of § 1983 indicates that

Congress intended to prove remedies for negligent acts, I would hold that one who does not intend

to cause and does not exhibit deliberate indifference to the risk of causing the harm that gives rise

to a constitutional claim is not liable for damages under § 1983." *Procunier*, 434 U.S. at 568.

"Further, negligence and gross negligence do not give rise to § 1983 liability." *Medina*, 960 F.2d at

1500. A school district may be held liable only if the board of trustees' decision manifested a

deliberate indifference to the welfare of school children. *Gonzalez*, 996 F.2d at 760. The Fifth Circuit

further held in *Gonzalez* that

> Inadequate, but constitutional policies and decisions rise to the same action plane as
> the unconstitutional policies considered in *Monell, Owen, Newport* and *Pembaur*.
> Only if a showing that they were enacted or made with deliberate indifference to their
> possible unconstitutional consequences.

*Id* at 759.

In applying the law to the facts of this case, it is clear that there is no evidence in any of the

policies that the LISD policymakers acted with deliberate indifference to the constitutional rights of

the Plaintiffs so as to find that the policymakers intentionally chose to ignore those rights. To the contrary, there is substantial evidence that LISD adopted policies that were constitutional and protected student's rights. [App. at 719.] First, LISD considered the application of Plaintiffs and reviewed its purposes. [App. at 718; App. at 593; App. at 598, 599, Hardin Dep. 12:24 - 13:10]. Second, the flier that was presented included a website which Hardin and Vogler reviewed. [App. at 1-511; App. at 598, 599, Hardin Dep. 12:24 - 13:10; App. at 559, Caudillo Dep., 92:1-12; App. at 593]. Third, Hardin met with the student applicants and their parents. [App. at 559, Caudillo Dep. 90:3-5, 92:7-12]. Fourth, as indicated hereinabove, the website showed inappropriate material which had a sexual content and described sexual activity. [App. at 1-511; App. at 612, 613, Hardin Dep. 67:18, 70:4]. Fifth, Hardin and Clemmons were aware of the federal law, *Children's Online Privacy Protection Act of 1998,* which required the school district to place filters on its computers for speech with a sexual content. [App. at 599, Hardin Dep.13:11-14; App. at 641, Clemmons Dep. 36:2-6]. Sixth, Hardin and Clemmons were both aware of state law which prohibited sex with minors. [App. at 527; App. at 669]. Seventh, Hardin and Clemmons were both aware of issues regarding harassment and potential disruption by means of telephone calls and visiting with school administrators. . [App. at 602, Hardin Dep. 25:8-26:10, 27:11-17; App. at 529-530; App. at 644, Clemmons Dep.45:11 - 46:9, 46:9 - 47:12, 47:21 - 48:24; App. at 672]. Clemmons and Hardin were aware of state and federal laws which allowed school administrators to regulate student speech. [App. at 672; App. at 530] Clemmons and Hardin were aware of the LISD Abstinence Policy. [App. at 670; App. at 528]. Clemmons and Hardin based their decisions on the above and believed the

interest of LISD to restrict speech with sexual content regarding sexual activity authorized them to deny the group recognition. [App. at 530; App. at 672].

LISD did not act with deliberate indifference to the constitutional rights of Plaintiffs. To the contrary, they carefully assessed the situation, applied the facts, its Board policy, the abstinence policy, state and federal law, GAP Youth's purposes and its website with links in order not to violate any of Plaintiffs' constitutional or rights.

In the alternative, if LISD made the wrong decision, it was a negligent decision which is not actionable under § 1983. *Medina*, 960 F.2d at 1500 .

Therefore, Plaintiffs cannot prove the essential element that LISD's custom or policy served as the moving force behind the violation, if any, because LISD did not act with deliberate indifference to Plaintiffs' constitutional or statutory rights.

## VI.

## CONCLUSION

In conclusion, LISD, Havens and Hardin are entitled to summary judgment as a matter of law. LISD does not have any unconstitutional policies regarding either their limited open forum nor rights of expression and association. LISD, Havens and Hardin did not violate Plaintiffs' constitutional or statutory rights as LISD has shown that it applied the well-being and maintaining order and discipline exceptions to the Equal Access Act in a viewpoint neutral manner and that they were not deliberately indifferent to Plaintiffs' constitutional or statutory rights. Thus, Plaintiffs' cannot meet each and every element of their causes of action.

WHEREFORE, PREMISES CONSIDERED, Defendants, LISD, Havens and Hardin, pray their Motion for Summary Judgment be granted on the basis that Plaintiffs cannot meet each and every element of their § 1983 requirements for liability to attach on any of their causes of action and that there are no genuine issues of material fact present as to these claims.

Respectfully submitted,

McWHORTER, COBB AND JOHNSON, L.L.P.
1722 Broadway
Post Office Box 2547
Lubbock, Texas 79408-2547
806/762-0214
806/762-8014 (FAX)

Ann Manning
State Bar No. 12950100
R. Michael McCauley, Jr.
State Bar No. 00797030
Timothy T. Pridmore
State Bar No. 00788224

By: _____
        Ann Manning

ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

This is to certify that on this the 20th day of October, 2003, a true and correct copy of the above and foregoing document has been sent by certified mail, return receipt requested to:

F. Brian Chase
LAMBDA Legal Defense
and Education Fund, Inc.
3500 Oak Lawn Avenue, Suite 500
Dallas, TX 75219-6722
*CM/RRR #7001 0320 0004 3918 4332*

Monty Wade Sullivan
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219
*CM/RRR #7001 0320 0004 3918 4479*

Ann Manning