# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF TEXAS

### LUBBOCK DIVISION

| | |
|---|---|
| YVONNE CAUDILLO by next friend, Brenda Caudillo; MIRAH EPSTEIN CURZER by next friend, Howard Curzer; and LUBBOCK HIGH SCHOOL GAY STRAIGHT ALLIANCE, an unincorporated association; | ) ) ) ) ) ) ) |
| **Plaintiffs** | ) ) |
| v. | ) Civil Action No. 5-03 CV 0165-C ) |
| LUBBOCK INDEPENDENT SCHOOL DISTRICT; WAYNE HAVENS, in his official capacity as Acting Superintendent of Lubbock Independent School District; DR. JACK CLEMMONS, individually; FRED HARDIN, in his official capacity as Assistant Superintendent for Secondary Schools of Lubbock Independent School District; | ) ) ) ) ) ) ) ) ) ) |
| **Defendants.** | ) ) ) |

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

NOV - 9 2003

CLERK, U.S. DISTRICT COURT
By _____
Deputy

---

### Plaintiffs' Brief in Response to Defendants' Motion for Summary Judgment

---

**LAMBDA LEGAL DEFENSE
AND EDUCATION FUND, INC.**
3500 Oak Lawn Avenue, Suite 500
Dallas, Texas 75219-6722
(214) 219-8585 telephone
(214) 219-4455 facsimile
By: F. BRIAN CHASE
Louisiana Bar Number 23450
Florida Bar Number 996653
Attorney for Plaintiffs



**Table of Contents**

Table Of Authorities...................................................................................................ii

Argument And Authorities ...........................................................................................1

    I.      Summary of Argument ...................................................................................1

    II.     Standard of Review ......................................................................................1

    III.    Objections to Relevance of Summary Judgment Evidence ....................................3

    III.    Defendants Violated The Equal Access Act ...........................................................6

    IV.    Defendants Have Violated Plaintiffs' First Amendment Rights ............................8

          A.       LISD May Not Bar All Discussion of Issues Related to Sex  ...................10

                 1.       LISD Has Not Excluded All Discussion About Sex or Sexuality and its Exclusion of the Lubbock GSA, Therefore, Constitutes Unlawful Viewpoint Discrimination. ...........................................10

                 2.       Defendants Cannot Trump Plaintiffs' First Amendment Rights Under the Guise of Protecting Plaintiffs' "Well-Being." .............12

                 3.       LISD Cannot Exclude the Lubbock GSA Based on its Abstinence-Only Curricular Policy. ................................................................17

                 4.       State Laws Governing Sexual Conduct Do Not Provide a Valid Basis to Exclude the Lubbock GSA. ............................................19

          B.       LISD May Not Exclude Gay and Lesbian Groups Based on General Fears of Harassment by Others .........................................................................21

    V.      Defendants are Liable for Damages ....................................................................24

Conclusion And Prayer For Relief ...............................................................................25

Certificate Of Service ................................................................................................26

## Table of Authorities

**Cases:**

*American Booksellers v. Webb*, 919 F.2d 1493 (11th Cir. 1990)....................................................20

*Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002)............................................................25

*Bethel Sch. Dist. v. Frasier*, 478 U.S. 675 (1986)..............................................................18, 19, 20

*Boyd County Gay Straight Alliance v. Bd. of Educ.*,
  258 F.Supp.2d 667 (E.D. Ky. 2003).....................................................11, 12, 13, 19, 28, 29

*Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60 (1983).......................................................18, 21

*Brandenburg v. Ohio*, 395 U.S. 444 (1969).....................................................................................26

*Burnside v. Byars*, 363 F.2d 744 (5th Cir. 1966).......................................................................17, 28

*Burson v. Freeman*, 504 U.S. 191 (1992).........................................................................................16

*Butts v. Dallas Ind. Sch. Dist.*, 436 F.2d 728 (5th Cir. 1971)..........................................................27

*Clark v. Dallas Ind. Sch. Dist.*, 806 F.Supp. 116 (1992)...............................................7, 11, 18, 19

*Colin v. Orange Unified Sch. Dist.*, 83 F. Supp. 2d 1135 (C.D. Cal. 2000) ...........................12, 15

*East High Gay/Straight Alliance v. Bd. of Educ.*,
  81 F.Supp.2d 1166 (D. Utah 1999)..................................................................................11, 19

*East High Sch. Prism Club v. Seidel*, 95 F.Supp.2d 1239 (D. Utah 2000)....................................11

*Franklin Cent. Gay/Straight Alliance v. Franklin Tp. Cmty Sch. Corp.*,
  2002 WL 32097530 (S.D. Ind. 2002)...............................................................................11

*Gay-Straight Alliance Network v. Visalia Unified Sch. Dist.*,
  262 F.Supp.2d 1088 (E.D. Cal. 2001).................................................................................11

*Gay Student Services v. Texas A & M Univ.*, 737 F.2d 1317
  (5th Cir. 1984), *cert. denied*, 471 U.S. 1001 (1985) ...................................................24, 25

*Ginsberg v. State of New York*, 390 U.S. 629 (1968).................................................................20

*Healy v. James*, 408 U.S. 169 (1972)........................................................................7, 9, 10

*Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988) ...................................18, 19, 20

*Herceg v. Hustler Magazine, Inc.*, 814 F.2d 1017 (5th Cir. 1987)....................................10

*Hsu v. Roslyn Union Free Sch. Dist.*, 85 F.3d 839 (2d. Cir. 1996)............................12, 13

*Lawrence v. Texas*, 123 S.Ct. 2472 (2003)..............................................................15, 24

*Limon v. Kansas*, 123 S.Ct. 2638 (2003)........................................................................25

*Meadowbriar Home for Children v. Gunn*, 81 F.3d 521 (5th Cir. 1996)...................29, 30

*Miller v. California*, 413 U.S. 15 (1973)..........................................................................20

*Monell v. Dept. of Social Services of City of New York*, 436 U.S. 658 (1978)................30

*N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886 (1982)...................................9, 10

*Piotrowski v. City of Houston*, 237 F.3d 567 (5th Cir. 2001)..........................................30

*Shanley v. Northeast Indep. Sch. Dist.*, 462 F.2d 960 (5th Cir. 1972).....................7, 21, 23, 27, 29

*Tinker v. Des Moines Indep. Cmty Sch. Dist.*, 393 U.S. 503 (1969)..........................17 - 20, 27, 29

*Universal City Studios, Inc. v. Reimerdes*, 111 F.Supp.2d 294 (S.D.N.Y. 2000)......................9, 10

*Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2nd Cir. 2001)........................9, 10

*U.S. v. Schein*, 31 F.3d 135 (3rd Cir. 1994)......................................................................2

*West Virginia State Bd. Of Ed. v. Barnette*, 319 U.S. 624 (1943).................................23

*Westside Cmty Bd. Of Educ. v. Mergens*, 496 U.S. 226 (1990).....................................19

*Widmar v. Vincent*, 454 U.S. 263 (1981).............................................................13, 17, 21

*Will v. Mich. Dept. of State Police*, 491 U.S. 58 (1987)................................................30

iii

**Statutes:**

20 U.S.C.A. § 4071, *et seq.*..............................................................................................13

Fed R. Civ. P. 56(c)..........................................................................................................7

Fed. R. Ev. 401.................................................................................................................8

Fed. R. Ev. 402.................................................................................................................8

Tex. Pen. Code Ann. §21.11 (Vernon 2003)..................................................................24

## ARGUMENT AND AUTHORITIES

### I.    SUMMARY OF ARGUMENT

Plaintiffs have demonstrated that the Defendants have violated both the Equal Access Act and the First Amendment.  Defendants argue, without citation to any directly relevant case law, that they are entitled to treat the Lubbock High School Gay-Straight Alliance (the "Lubbock GSA") differently from the other noncurricular student groups that meet and advertise on the campus of LHS.  Defendants base their assertion on the contentions that: (1) the Lubbock GSA maintains a small website that contains links to a much larger website written entirely by third parties, a small fraction of which contains factually accurate information about the avoidance of sexually transmitted diseases; (2) LISD does not allow discussion of means to avoid pregnancy and sexually transmitted diseases other than abstinence in the official curriculum, and; (3) vague fears that other students or the community might cause disruption if the Plaintiffs are treated the same as other groups that meet and advertise meetings at LHS.  None of these theories has ever been recognized  by any court as a defense to a valid claim under the Equal Access Act or the First Amendment in the context of a student-initiated club.

In lieu of citing directly relevant case law, the Defendants toss out a hodgepodge of statutes and decisions, in contexts other than student non-curricular clubs, that merely support the truism that minors are sometimes treated differently than adults.  While these cases  and laws may be helpful in cases regarding obtaining a drivers license or purchasing alcohol, they have no relevance here.  While the government may control many aspects of the lives of young people, school officials cannot silence students who seek to form a student club during non-instructional

1

time at a public secondary school because they dislike or disapprove of those students or their speech.

This is not a case about whether the LISD can set its own curriculum. This is not a case about school-sponsored speech. This is not a case involving a "captive audience" of students or a school publication. This is a case about student-initiated speech and assembly on the grounds of a public secondary school during non-instructional time. The fact that Defendants filed a forty-five page brief yet fail to cite even a single case involving such student-initiated speech is telling. The controlling case law unanimously rejects Defendants' arguments against Plaintiffs and the Lubbock GSA and requires that Defendants' motion for summary judgment be denied.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.[1]  It is undisputed that Defendants refused to allow the Lubbock GSA to meet and announce meetings on the same basis as other noncurricular groups. Therefore, it is Defendants who bear the burden of demonstrating that their infringement on plaintiffs' rights was constitutionally permissible.[2]  Defendants do not meet that burden.

---

[1] Fed.R.Civ.P. 56(c)

[2] *Healy v. James*, 408 U.S. 169, 184 (1972) ("once petitioners had filed an application in conformity with the requirements, the burden was upon the College administration to justify its decision of rejection"); *Shanley v. Northeast Independent School Dist.*, 462 F.2d 960, 969 (5th Cir. 1972); *Clark v. Dallas Independent School Dist.*, 806 F. Supp. 116, 119-20 (N.D. Tex. 1992).

## III. OBJECTIONS TO RELEVANCE OF SUMMARY JUDGMENT EVIDENCE

In the Appendix to their motion for summary judgment, Defendants have attached approximately 500 web pages, none of which were written, created or maintained by the Plaintiffs.[3] The only connection between these pages and the Defendants is the fact that they can be accessed through a series of "hyperlinks" from a website maintained by Lubbock GSA.[4]

From this voluminous exhibit, Defendants cull a handful of pages dealing with birth control and safer sex in an attempt to argue that the Lubbock GSA promotes sexual activity. As demonstrated in Plaintiffs' Brief in Support of Motion for Summary Judgment, material similar to the content of the websites in question is protected speech both under the First Amendment and the Equal Access Act, nevertheless Plaintiffs object to the admission of these pages and move to strike them, because they are not relevant to any issue in this case.[5] The content of the web pages is irrelevant both because it is not legally attributable to Plaintiffs, and because it neither incites anyone to imminent illegal action nor disrupts the school.

Defendants have established no legally permissible foundation for imputing the content of these pages to the Plaintiffs. The only connection between these pages and this case is that it is possible to reach the pages through a series of links, starting on the Plaintiffs' home page.[6]

The Southern District of New York and the Second Circuit have, in recent years, rejected

---

[3] *See* Appendix to Defendants' Motion for Summary Judgment, Tab 2, at 000010 to 000511. The Lubbock GSA's actual web site consists of fewer than a dozen pages describing the group's philosophy, answering questions and giving contact information. App. at 1-7. Plaintiffs have no objection to the admission of these pages.

[4] hy•per•link (hi-per-link)˘n. v.1. Underlined text within an electronic document. When clicked with the mouse, the viewer will be taken to **another place**. 2. A graphic or part of a graphic that contains a link to **another location**. 3. The process of creating a link that will take the viewer to **another location**. http://www.essdack.org/hyperlinks/definition.htm (emphasis added).

[5] *See* FED. R. EVID. 401, 402.

[6] Hardin, who conducted the initial review of the Lubbock GSA site, testified that he did not know what a hyperlink was and could not recall how many links he went through to reach the content at issue. Hardin Deposition

"guilt by linking." In *Universal City Studios, Inc. v. Reimerdes*,[7] the court recognized that web links "do a great deal to promote the free exchange of ideas and information that is a central value of our nation" and that holding web site owners responsible for the content of linked sites would raise "grave constitutional concerns."[8] In the copyright context, the court held that the content of linked sites may not be imputed to web site owners without "clear and convincing evidence" that they knew of the offending material and created the link in order to disseminate it.[9] Defendants offer no such evidence.

In rejecting "guilt by association," *Reimerdes* accords with Supreme Court precedent recognizing that the Constitution does not permit the conduct of one individual or group to be imputed to another unless the conduct is authorized or "specifically ratified."[10] Any lesser standard would "impermissibly burden the rights of political association that are protected by the First Amendment."[11] In the educational setting, the Court has held that officials may not deny recognition to a group merely because it is linked to other groups that engage in illegal or otherwise undesirable conduct. In *Healy v. James*,[12] the court explained that "the fact that some SDS [Students for a Democratic Society] chapters had been associated with disruptive and violent campus activity" could not be used as a basis for denying recognition to a new SDS chapter.[13] Officials cannot rely on "guilt by association;" they must prove "a knowing affiliation with an organization possessing unlawful

---

at 15, 69-70.

[7] 111 F.Supp.2d 294 (S.D.N.Y. 2000), *aff'd sub nom. Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2d Cir 2001).

[8] *Id.* at 340.

[9] *Id.* at 341.

[10] *N. A. A. C. P. v. Claiborne Hardware Co.* , 458 U.S. 886, 930 (1982).

[11] *Id.* at 931.

[12] 408 U.S. 169 (1972).

[13] *Id.* at 185-87.

4

aims and goals, and a specific intent to further those illegal aims."[14]

The *Reimerdes* prohibition on "guilt by linking," which was established in the commercial context, must be applied even more stringently to this case, which involves speech of great public concern, including political speech.[15]   The web pages include information and opinions about political activism, health, discrimination, religion and other topics.  To the extend Defendants argue that some of the pages contain material that they find objectionable,, Defendants have presented no evidence that any members of the Lubbock GSA members endorsed, ratified, or even knew about the few specific excepts from the material that Defendants have chosen to highlight.[16]

Defendants quote selectively from claim that some web pages and claim that these "endorse" or "advocate" sexual conduct or drug abuse by describing it in positive terms.[17]   The quoted statements are immaterial absent some evidence that they are "directed to inciting or producing imminent lawless action" or "actions which materially and substantially disrupt the work and discipline of the school."[18]  Defendants offer no evidence in support of either proposition.  The Fifth Circuit has held as a matter of law that positive discussions of sexual conduct, even in "glowing terms" do not constitute advocacy or incitement of the sexual conduct itself.[19]   Defendants themselves admit that discussion of safer sex is not an endorsement of sexual activity.[20]

Defendants' use of these web pages is even more troubling in light of the fact that no other

---

[14] *Id.* at 186.

[15] *See N. A. A. C. P. v. Claiborne Hardware Co.*, 458 U.S. 886, 915 (1982) (protesting discrimination is "essential political speech lying at the core of the First Amendment.").

[16] Caudillo testified that the links were intended to direct visitors to potentially helpful information, not to promote sexual activity.  Caudillo Deposition at 126-29 (App. at 12-15).

[17] Defendants' Brief at 18-20.

[18] *Healy*, 408 U.S. at 187-89.

[19] *Herceg v. Hustler Magazine, Inc.*, 814 F.2d 1017, 1022-23 (5th Cir. 1987).  In addition, Defendants have offered no evidence that the web pages themselves, considered as a whole, are "obscene" or "harmful to minors" under any accepted legal definition of those terms.  *See* Section IV,A,2, *infra.*

student group has been subjected to such an investigation.[21] This evidence is not admissible to justify Defendants' denial of Plaintiffs' rights.

Moreover, the same types of information that Defendants now object to and cite as the sole basis for denying the Plaintiffs' right to meet can be found on web pages linked to Defendants' own Internet sites. For example, the home page for Coronado High School, which is also in the LISD and is accessible from the LISD website, links to web sites sponsored by the University of Texas at Austin and Rice University.[22] On those sites, students can find extensive discussions of sexual practices, including explicit instructions on the use of condoms, dental dams and other devices.[23]

Web pages such as these, produced by non-parties, are simply not relevant to any issue in this case. Evidence related to such pages should be stricken in its entirety.

## IV. DEFENDANTS HAVE VIOLATED THE EQUAL ACCESS ACT.

Plaintiffs allege not only a violation of the First Amendment, but also a violation of the Equal Access Act. Yet, remarkably, Defendants fail to cite a single case decided under the Equal Access Act related to a gay-straight alliance.[24] To read Defendant's motion, one would think that no court had ever addressed the applicability of the Equal Access Act to a request by a Gay-Straight Alliance for recognition. In fact, several have, and each court has ruled against Defendants' position.[25]

---

[20] *App.* at 62-65.

[21] Hardin Deposition at 13-14 (App. at 16-17).

[22] App. at 25.

[23] App. at 26-30.

[24] Indeed, Plaintiffs' review of defendants' 58 cited cases reveals mentions of the Equal Access Act in only two of them: a quick acknowledgment that the Act does not apply to primary schools (*Good News Club v. Milford Central School*, 533 U.S. 98, 118 n.8) and a holding that the Act does not cover simple distributions of religious tracts, nor does it provide the exclusive means by which students can assert their First Amendment rights. *Clark v. Dallas Independent School Dist*. 806 F.Supp. 116, 120, 121 (N.D. Tex. 1992).

[25] See, e.g., *Boyd County High Sch. Gay Straight Alliance v. Board of Educ.*, 258 F.Supp.2d 667 (E.D. Ky. 2003); *Franklin Cent. Gay/Straight Alliance v. Franklin Tp. Cmty Sch. Corp.*, 2002 WL 32097530 (S.D. Ind. 2002); Gay-Straight Alliance Network v. Visalia Unified Sch. Dist., 262 F.Supp.2d 1088 (E.D. Cal. 2001); *East High Sch. Prism Club v. Seidel*, 95 F.Supp.2d 1239 (D. Utah 2000); *East High Gay/Straight Alliance v. Board of Educ.*, 81



Similarly, a reader of Defendants' motion would think that Defendants are the first to argue that

denying recognition to a student organization is permissible, because of the "well-being" and "order

and discipline" language of the Equal Access Act.  Again, courts have addressed these exact

arguments and rejected them.[26]

Defendants repeatedly suggest that they have broad authority to regulate speech if it

conflicts with their subjective judgment about the "well being" of students."  Indeed, Defendant

Clemmons has testified that it is the "duty" of the LISD to block any speech that, in its sole

discretion, is not for the well-being of students or that conflicts, in his view, with LISD's

abstinence-only curricular policy.[27]  But Defendants are wrong.  The Second Circuit has held that

the Equal Access Act forbids a school from regulating a student organization's policy on the

grounds that it conflicts with school policy. [28] In *Hsu*, a religious group sought to reserve its top

leadership positions to Christian students, in conflict with the school district's nondiscrimination

policy.  The court issued an injunction against interfering with the student group, on the basis

that " the Equal Access Act is a definite, though measured, interference in these purely local

decisions."

Furthermore, the Equal Access Act does not contain a broad exemption for the perceived

"well-being" of students.  Taken in context, along with other relevant clauses, the Act provides

that it shall not be construed to limits a school's authority "to maintain order and discipline on

school premises, to protect the well-being of students and faculty, and to assure that attendance

---

F.Supp.2d 1166 (D. Utah 1999); Colin, 83 F.Supp.2d 1135.
    [26] *Boyd County*, 258 F.Supp.2d at 690, *Hsu By and Through Hsu v. Roslyn Union Free School Dist. No. 3*, 85 F.3d 839, 870 (2d Cir. 1996).
    [27] *See* App. at 22.
    [28] *Hsu*, 85 F.3d at 872.

7

of students at meetings is voluntary."[29] These clauses pertain to regulation of potentially disruptive, dangerous or coercive **activities**.[30] Defendants claim that they can silence speech because they believe that the speech itself might cause harm, but courts have made it clear that this isn't what the Act's "well-being" language means.[31] Defendants can stop conduct or activities if they are disruptive or it can be shown that they are an incitement to harmful or disruptive conduct, but Defendants cannot silence Plaintiffs merely because they dislike Plaintiffs' speech.

Defendants have offered no evidence that the Lubbock GSA's activities would disrupt order and discipline on school premises or result in involuntary attendance at meetings. "A school's conclusory statement that prayer meetings will substantially and materially impede the orderly conduct of the school is an insufficient weight in the balance struck by the Act."[32] At most, Defendants have expressed a subjective belief that the Lubbock GSA's **ideas** are somehow undesirable. This is exactly why they must be protected; and under the plain language of the Equal Access Act, it does not justify denying Plaintiffs' right to form a GSA.

## V. DEFENDANTS HAVE VIOLATED PLAINTIFFS' FIRST AMENDMENT RIGHTS.

When the school makes its facilities generally available for the activities of student groups, the school has designated those facilities as a "limited public forum" and may not discriminate against those student groups based on their content or subject matter.[33] Indeed, the Constitution commands that whatever forum a school may create for its students' free expression of ideas, the

---

[29] 20 U.S.C.A. § 4071(f) (emphasis added).
[30] *Boyd County*, 258 F.Supp.2d at 680.
[31] *Id.*
[32] *Hsu*, 85 F.3d at 872.
[33] *Widmar v. Vincent*, 454 U.S. 263, 267-70 (1981).

school may not pick and choose among the ideas or viewpoints that find expression within the school's forum.[34] The Constitution's guarantee "is not confined to the expression of ideas that are conventional or shared by a majority."[35]

Defendants claim that they can silence the Plaintiffs because they have "closed the forum to all issues relating to sex and sexual activity for the well-being of students;" and, because they predict that other students might harass the Plaintiffs. Both of these claims are simply wrong.

As an initial matter, Defendants' argument relies on the mistaken premise that a high school gay-straight alliance is by definition about "sexual activity.[36]" The very argument made by Defendants here, that talking about gay people, homophobia and related topics, is actually talk about sexual activity, has been refuted.[37] The stated purposes of the Lubbock GSA clearly demonstrate that the group seeks the right to discuss issues of important public concern. Surely Defendants cannot argue that the extensive news coverage and public discussion regarding the place of gay and lesbian citizens in American society is all "based on sexual activity." If this is, in fact, their argument, they fail to explain how issues as diverse as violent assaults against gay people, adoption by same-sex couples, legislation prohibiting employment discrimination based on sexual orientation, and indeed, the Equal Access Act and First Amendment implications of the present case are "based on sexual activity." Clearly there is a vast realm of issues directly impacting gay and lesbian citizens that have nothing whatsoever to do with sexual activity itself.

Indeed, the Supreme Court has acknowledged that treating issues relating to gay and lesbian people as merely issues of sexual conduct is both inaccurate and demeaning. As Justice

---

[34] *East Gay/Straight Alliance v. Bd. of Educ.*, 81 F. Supp. 2d 1166, 1170 (D. Utah 1999).
[35] *Id.*
[36] Defendants' Motion for Summary Judgment, P. 26.

9



Kennedy notes:

> To say that the issue ... was simply the right to engage in certain sexual conduct demeans the claim the individual put forward just as it would demean a married couple were it to be said that marriage is simply about the right to have sexual intercourse.[38]

The rights claimed by the Lubbock GSA are not about sexual intercourse or sexual activity. The Plaintiffs in this case claim the right to meet, the right to speak their minds, the right to discuss important issues, and the right to seek support from their peers. These rights are protected under both the Equal Access Act, as explained above, and the First Amendment, as set forth below, therefore Defendants' motion for summary judgment should be denied.

**A.      LISD May Not Bar All Discussion Of Issues Related To Sex.**

**1.      LISD Has Not Excluded All Discussion About Sex or Sexuality and Its Exclusion of the Lubbock GSA, Therefore, Constitutes Unlawful Viewpoint Discrimination.**

Defendants claim that LISD has "closed its limited open forum to all issues relating to sex and sexual activity" in a viewpoint-neutral manner.[39] This assertion is manifestly untrue. First, Defendants have offered no evidence that students are generally forbidden to discuss abortion, sexual harassment or other issues related to human sexuality on campus. To the contrary, web sites that students can access through the district's computers contain information on these topics. Second, Defendants already allow groups that discuss monogamy, heterosexuality and homosexuality to meet, for example, the Fellowship of Christian Athletes, which is a recognized student group, requires its volunteer leaders to agree that "[n]either heterosexual sex outside of marriage nor any

---

[37] *Colin,* 83 F.Supp. at 1135.
[38] *Lawrence,* 123 S.Ct. at 2477.
[39] Defendants' Brief at 13.

homosexual act constitute an alternate lifestyle acceptable to God."[40] If Defendants argue that any discussion of "heterosexuality" or "homosexuality" is, by definition, about sex, then LISD would also have to exclude the Fellowship of Christian Athletes. Having allowed that group's view, which is clearly not supportive of gay people, while excluding Plaintiffs, Defendants have engaged in viewpoint discrimination.

Defendants make the misguided argument that their actions are "not viewpoint discriminatory" because they were taken in response to "Texas law, Federal law and LISD policy." This makes no sense. As explained herein, there is no evidence that the GSA intended to advocate any sexual practices for youth. However, even if one were to speak out in opposition to current law or policy, suppression of that speech would be the very definition of "viewpoint discrimination." Because Defendants have no evidence that the GSA intended to incite anyone to imminent unlawful action, such viewpoint discrimination is forbidden.

As demonstrated in this brief and in Plaintiff's Brief in Support of Motion for Summary Judgment, Defendants' claim of viewpoint neutrality is both legally and factually inaccurate. Nevertheless, it is important to note that the Plaintiffs are entitled to prevail even if Defendants have not engaged in viewpoint-based discrimination. The First Amendment does not merely protect citizens from censorship based on viewpoint. Indeed, free speech protections prohibit "not only . . . a restriction on a particular viewpoint, but also to a prohibition of public discussion of an entire topic."[41] Where, as here, a school has created a limited public form, a blanket content-based restriction on discussion cannot survive unless the restriction is "necessary to serve a compelling

---

[40] App. at 41.
[41] *Burson v. Freeman*, 504 U.S. 191 (1992).

11

state interest" and that the restriction is "narrowly drawn to achieve that end."[42] Indeed, the Supreme

Court has held that "the most exacting scrutiny" is required "in cases in which a State undertakes to

regulate speech on the basis of its content."[43] The Defendants have not even attempted to articulate a

defense that could survive such an exacting standard of scrutiny. The Defendants have discriminated

against the Plaintiffs based on the perceived content of Plaintiffs' speech, and therefore the

Defendants are clearly not entitled to summary judgment.

> ### 2. Defendants Cannot Trump Plaintiffs' First Amendment Rights Under the Guise of Protecting Plaintiffs' "Well-Being."

Even if LISD actually excluded all student speech related to sex or sexuality, rather than

selectively policing the view is will not allow, LISD does not have the power to silence students

on this topic. Public school students have a right to freedom of speech.[44] Amazingly, Defendants

ignore the issue in this case -- student-initiated speech -- and instead cite cases standing for the

unremarkable proposition that schools can take certain actions (searches, dress codes, school-

sponsored speech) with regards to students.[45] Whatever powers schools may have *vis a vis*

students in other contexts, *Tinker* and its progeny make clear that school administrators may

curtail students' First Amendment rights only if they can demonstrate that the students' activities

would "substantially interfere with the work of the school or impinge upon the rights of other

---

[42] *Widmar v. Vincent*, 454 U.S. 263, 274 (1981).

[43] *Id.* at 277.

[44] *See, e.g., Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503, 506 (1969); *Burnside v. Byars*, 363 F.2d 744, 747-48 (5th Cir. 1966).

[45] *See* Defendants' Brief at 23-28. Interestingly, the case that Defendants trumpet as lessening the constitutional rights of children actually struck down a law requiring parental consent prior to an abortion. *Bellotti v. Baird*, 443 U.S. 622 (1979). Moreover, *Bellotti* reaffirms *Tinker*, pointing out that the decision was based on facts remarkably similar to this case: "the challenged policy was intended primarily to stifle any debate whatsoever--even nondisruptive discussions--on important political and moral issues." 443 U.S. at 637 n.15.

students."[46]

Although *Tinker* expressly commanded that a school may not "confine the permissible exercise of First Amendment rights to . . . supervised and ordained discussion in a school classroom,"[47] Defendants claim the power to limit discussion of sex to "the appropriate class setting."[48] Defendants assert that "the U.S. Supreme Court ruled that expression with regard to sex is not entitled to constitutional protection."[49] The Supreme Court has done no such thing. In fact, the Court has explicitly recognized that "adolescent children apparently have a pressing need for information about contraception."[50]

Defendants cite *Bethel School District v. Fraser*[51] and *Hazelwood School District v. Kuhlmeier*,[52] but neither of those cases has ever been interpreted to apply to student-initiated speech during non-instructional time. Defendants blithely assert that "[e]ven though these cases apply to the school-sponsored setting, they still are applicable to the Equal Access Act in a public school limited open forum." Defendants cite no authority for this proposition and ignore the many courts that have recognized the crucial distinction between school-sponsored speech and student-initiated speech. The Northern District of Texas has expressly held that *Bethel* and *Hazelwood* are limited to speech that is actually sponsored by the school. Indeed, the Northern District has held that both *Bethel* and *Hazelwood* are "easily distinguished" from cases involving student-initiated speech.[53] *Bethel* involved a "**school-sponsored** educational program."[54] The

---

[46] *Tinker*, 393 U.S. at 509.
[47] *Id.*
[48] Clemmons Deposition at 51-52 (App. at 35-36).
[49] Defendants' Brief at 36.
[50] *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 75 n.30 (1983).
[51] 478 U.S. 675 (1986).
[52] 484 U.S. 260 (1988).
[53] *Clark v. Dallas Ind. School Dist.*, 806 F. Supp. 116, 119-20 (N.D.Tex. 1992) (noting that both *Bethel*

13

Court found that the school district "had an interest in protecting an essentially captive audience of minors from lewd and indecent language in a setting **sponsored by the school**."[55] *Hazelwood* involved a school-sponsored newspaper, and the Court held that a school could exercise control over the "style and content of student speech in **school-sponsored** expressive activities."[56] The Supreme Court has explained on several occasions that allowing a group to meet on campus does not imply sponsorship, approval or endorsement by the school.[57] As the court explained in *Clark*, such "voluntary, student-initiated" speech is governed by the standards of *Tinker*, not the standards for school-sponsored speech set out in *Bethel* or *Hazelwood*.[58]

In *East High Gay/Straight Alliance v. Board of Education of Salt Lake City School Dist.*,[59] the court specifically rejected the argument that *Bethel* and *Hazelwood* could be invoked to exclude a gay straight alliance from campus. This is understandable, since both decisions are clearly distinguishable on their facts. *Bethel* involved a speech before a captive audience of students at a school-sponsored assembly.[60] Hazelwood involved the content of a school-sponsored and school-financed publication.[61] The *Bethel* decision "speaks to the form and manner of student speech, not its substance. It addresses the mode of expression, not its content or viewpoint. Rather than limiting

---

and *Hazelwood* involved restriction of activities that were in some way sponsored by the school.").

[54] *Bethel*, 478 U.S. at 677 (emphasis added).

[55] *Id.* at 680 (emphasis added).

[56] *Hazelwood*, 484 U.S. at 273 (emphasis added).

[57] See, e.g., *Board of Ed. of Westside Community Schools v. Mergens*, 496 U.S. 226, 250 (1990); see also *East High Gay/Straight Alliance v. Board of Education of Salt Lake City School Dist.*, 81 F.Supp.2d 1166, 1194-95 (D.Utah 1999) ("Allowing a student group to meet on school premises during non-instructional time does not equate with publishing a school newspaper or producing a school play . . . . Students, parents, and members of the public likely will not perceive student club and group activities as being a school function, or as 'bearing the imprimatur of the school.'); *Boyd County High School Gay Straight Alliance v. Board of Ed. of Boyd County*, 258 F.Supp.2d 667, 690 -691 (E.D.Ky. 2003).

[58] *Clark*, 806 F. Supp. at 120.

[59] 81 F.Supp.2d 1166 (D.Utah 1999).

[60] *Bethel School Dist. v. Fraser*, 478 U.S. 675 (1986).

[61] Hazelwood School District v. Kuhlmeier, 484 U.S. 260 (1988).

or abandoning *Tinker,* [*Bethel*] simply distinguishes it."[62] Likewise, the decision in *Hazelwood* "distinguishes *Tinker* rather than retreating from its principles" by limiting its analysis to school-sponsored speech.[63]

Defendants also misstate the relevant statutory law. Defendants assert that "Congress requires school officials to prohibit access to websites which contain any words that have any form of sexual content," citing the "Children's Online Privacy Protection Act of 1998, 13 U.S.C. § 1301."[64] The Children's Online Privacy Protection Act of 1998, which is actually codified at 15 U.S.C. § 6501 et seq., not 13 U.S.C. § 1301, does not contain any such provisions. Moreover, even if this were a requirement, it is not implicated here as Defendants can easily meet this requirement by placing the appropriate filtering software on its computers.

Defendants have offered no evidence that Plaintiffs' speech meets any accepted legal definition of "obscene" or "harmful to minors." At a minimum, a constitutionally permissible definition of "obscenity" or "harmful to minors" requires that the speech, taken as a whole, appeals to a prurient interest and lacks "serious literary, artistic, political, or scientific value."[65] As applied to minors, this test means that "if any reasonable minor . . . would find serious value, the material is not 'harmful to minors.'"[66] Reasonable minors could certainly find political and scientific value in discussions of safe sex. Such information could literally save the minor's life, either by discouraging

---

[62] *Id.* at 1193 ("Examined carefully, [*Bethel*] does not diminish *Tinker*'s protection of a student's right to express an unpopular view.").

[63] *Id.* at 1194-95.

[64] Defendants' Brief at 16.

[65] *Miller v. California,* 413 U.S. 15, 24 (1973). The definition of "harmful to minors" upheld in *Ginsberg v. State of New York,* 390 U.S. 629 (1968), was even more restrictive, requiring that the material be "utterly without redeeming social importance for minors." *Id.* at 646.

[66] *American Booksellers v. Webb,* 919 F.2d 1493, 1504 -05 (11th Cir. 1990) (citing *Pope v. Illinois,* 481 U.S. 497 (1987)).

15

sexual activity or explaining effective ways to prevent disease.[67]   The Defendants' refusal to distinguish between legitimate discussion and prurient depictions of sex is profoundly troubling and exclusion of speech because of that refusal violates the First Amendment.[68]

In order to restrict Plaintiffs' rights, Defendants would have to show that the restriction is "necessary to serve a compelling state interest" and that the restriction is "narrowly drawn to achieve that end."[69]   They cannot meet that burden.  First, given their allowing of some speech related to sex and sexuality and the availability of anti-gay websites on LISD computers, they cannot show that their interest is "compelling."  Furthermore, even assuming that Defendants have a compelling interest in censoring student-initiated speech relating to sex, it is untenable to suggest that a complete prohibition of the GSA is a "narrowly tailored" action to address that interest.  As Defendants concede, the Lubbock GSA expressed a large number of purposes and potential topics for discussion at meetings.  Accordingly, Defendants' blanket ban on Plaintiffs' access to the campus of LHS is improper and their motion for summary judgment should be denied.

---

[67] *See* Caudillo Deposition at 129 (App. at 14); *see also Bolger*, 463 U.S. at 75 n.30  (1983) (noting that "adolescent children apparently have a pressing need for information about contraception"); *Shanley*, 462 F.2d at 964 (high school students' discussion of birth control could not "remotely be considered libelous, obscene, or inflammatory."); *see also U.S. v. Schein*, 31 F.3d 135, 137 (3d Cir. 1994) ("[M]aterials which promote public health are not obscene just because they graphically depict human sexual . . . acts.").

[68] For example, Hardin refused to acknowledge a difference between "pedophiles . . . presenting images or graphic discussions of sex" and "students themselves . . . engaged in conversations related to safe sex."  Hardin Deposition at 60-61 (App. at 23-24).

[69] *Widmar* 454 U.S. at  274.

16

### 3. LISD Cannot Exclude the Lubbock GSA Based on Its Abstinence-Only Curricular Policy.

Defendants assert repeatedly that allowing the Lubbock GSA to meet would violate LISD's abstinence-only curriculum, but that is a logical impossibility. By its own terms, the LISD policy applies only to curriculum. The activities of a non-curricular group, by definition, cannot fall under the policy. "We think that secondary school students are mature enough and are likely to understand that a school does not endorse or support student speech that it merely permits on a nondiscriminatory basis."[70] By the same token, a Bible study group cannot be compelled to teach evolution, even if evolution is part of the school curriculum.[71]

In connection with its policy, LISD takes the position "that there is no such thing as safe sex outside of monogamous relationships."[72] Defendants have yet to explain how, if at all, discussion about safe sex or AIDS conflicts with this. More importantly, the merits of abstinence-only programs in educating youth and helping them make smart choices about sexual acts is a point of considerable public debate, and Defendants have no right to require students to agree with them. Nevertheless, Defendants take the constitutionally untenable position that LISD may prohibit criticism of its policy decisions and bar any groups whose beliefs conflict with those of LISD:

Q    Do you think that students can discuss the merits of an abstinence policy on
     campus during noninstructional time without violating the policy?
A    No.
Q    And why is that?
A    Because I mean any discussion that would be contrary to the abstinence policy
     would not be something that the administration could support.
Q    And why couldn't they support it?
A    Because it's policy.

---

[70] *Mergens*, 496 U.S. at 250.
[71] Indeed, a fundamental purpose of the Equal Access Act is to allow student-initiated discussion on subjects that the school does not – or even cannot – teach to the students itself. *Id. at 238.*
[72] Defendants' Brief at 15.

17

Q      So once a policy is in place, there's no further discussion about the merits of that
       policy?
A      Certainly.[73]

Hardin further testified that LISD would not allow any student group to meet if its **tenets** are not

congruent with the LISD policy."[74] In other words, LISD does not stop at regulating speech.  LISD

claims the right to dictate students' **beliefs** as well.[75]

Such a view of governmental authority is, to put it mildly, inconsistent with constitutional

constraints.  School boards are not empowered to prohibit discussion, even if critical, of their own

policies.  As the Fifth Circuit explained in *Shanley v. Northeast Independent School District*,[76]

"[w]ithout discussing any ramifications, since no discussion is compelled, suffice it to say that [a

school board's] aversion to 'criticism' is not a constitutionally reasonable justification for forbidding

the exercise of First Amendment expression. The First Amendment's protection of speech and

expression is part of the Bill of Rights precisely because those governed and regulated should have

the right and even the responsibility of commenting upon the actions of their appointed or elected

governors and regulators."[77]

In the landmark case *West Virginia State Board of Education v. Barnette*,[78] the United States

Supreme Court held that school boards had no right to demand that students conform their opinions

to official policy:

> The Fourteenth Amendment, as now applied to the States, protects the citizen against
> the State itself and all of its creatures -- Boards of Education not excepted. These

---

[73] Hardin Deposition at 36 (App. at 22)..

[74] Hardin Deposition at 22 (App. at 18) (emphasis added).

[75] It is important to reiterate: Defendants cannot prove that Plaintiffs' **conduct** would violate LISD policy, because the policy does not apply to non-curricular speech.  Defendants' complaint is that the Plaintiffs' **beliefs** failed to conform to LISD's views.

[76] 462 F.2d 960 (5th Cir.1972).

[77] *Id.* at 973 n.10.

[78] 319 U.S. 624 (1943).

have, of course, important, delicate, and highly discretionary functions, but none that they may not perform within the limits of the Bill of Rights. . . . Probably no deeper division of our people could proceed from any provocation than from finding it necessary to choose what doctrine and whose program public educational officials shall compel youth to unite in embracing.  [I]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion . . .[79]

Accordingly, Defendants' fear that the Lubbock GSA might contradict or criticize LISD policy is not a tenable defense to Plaintiffs' claims and, therefore, Defendants are not entitled to summary judgment.

### 4.    State Laws Governing Sexual Conduct Do Not Provide A Valid Basis To Exclude The Lubbock GSA.

Defendants repeatedly refer to the Texas sodomy law, TEX. PENAL CODE 21.06. Defendants admit that this statute has been held unconstitutional[80] but maintain that the statute is somehow relevant to their continued refusal to respect Plaintiffs' constitutional rights. Defendants also point out another artifact of Texas law, section 21.11(a), which permits sex between heterosexual teenagers while criminalizing the same conduct between members of the same sex.  This particular statute has not yet been expressly declared unconstitutional, but it is in any event a slender reed on which to base a wholesale violation of Plaintiffs' rights.[81]

Constitutional or not, neither Section 21.06 nor Section 21.11 is relevant to any issue in this case.  Both statutes address conduct, not speech, and have no bearing on the exercise of First Amendment rights.  In 1984, nearly two decades before *Lawrence*, the Fifth Circuit held that the sodomy statute did not restrict students' right to free speech.  In *Gay Student Services v. Texas A &*

---

[79]  *Id.*

[80]  *Lawrence v. Texas*, 123 S.Ct. 2472 (2003).

[81]  The day after the *Lawrence* decision was issued, the Supreme Court vacated the judgment of the Court of Appeals of Kansas, which had upheld the conviction of a boy under a law similar to Section 21.11.  The Court

19

*M University*,[82] the court explained that a group's support for gay and lesbian rights did not cross the

"critical line . . . between advocacy and action" and observed that "[t]he mere 'undifferentiated fear

or apprehension' of illegal conduct . . . is not enough to overcome First Amendment rights, and

speculation that individuals might at some time engage in illegal activity is insufficient to justify

regulation by the state."[83]   The court emphasized that "while Texas law may prohibit certain

homosexual practices, no Texas law makes it a crime to be a homosexual."[84]  Every court that has

ever considered the issue has reached the same conclusion.[85]

More generally, the mere assertion that speech may condone underage sex is not a valid basis

for curtailing First Amendment rights.  The fear that information might "legitimize sexual activity of

young people" does not justify restricting free speech.[86]  In *Ashcroft v. Free Speech Coalition*,[87] the

Court held that the government could not ban depictions or discussions of "teenage sexual activity"

in order to deter potentially illegal sexual conduct involving minors.  In language that applies to this

case with equal force, the court explained that "[t]he mere tendency of speech to encourage unlawful

acts is not a sufficient reason for banning it. . . . The government may not prohibit speech because it

increases the chance an unlawful act will be committed 'at some indefinite future time.'"[88]   The

---

remanded the matter for reconsideration in light of its *Lawrence* decision.  *Limon v. Kansas*, 123 S.Ct. 2638 (2003).

[82]  737 F.2d 1317 (5th Cir. 1984), *cert. denied*, 471 U.S. 1001 (1985).

[83]  *Id.* at 1328-29.

[84]  *Id.* at 1329 (emphasis in original).  Defendants do not cite this case, although they seem to attempt to distinguish it by saying that "University students, being of legal age, have the legal right to make decisions regarding their own sexual activity . . ." (Brf. at 24).  This was certainly not the state of the law in 1984; the *Gay Student Services* court assumed the validity of the sodomy law as applied to adult students, but still held that a gay student group had the right to meet.

[85]  See *Gay Students Organization v. Bonner*, 509 F.2d 652, 662-63 (1st Cir. 1974); *Gay Alliance of Students v. Matthews*, 544 F.2d 162, 164-66 (4th Cir. 1976); *Gay Lib v. University of Missouri*, 558 F.2d 848, 853-55 (8th Cir. 1977); *Student Coalition for Gay Rights v. Austin Peay State University*, 477 F. Supp. 1267, 1274 (M.D. Tenn., 1979).

[86]  Carey v. Population Services, Int'l, 431 U.S. 678, 701 (1977).

[87]  535 U.S. 234 (2002).

[88]  *Id.* at 253 (citations omitted).

20

government may prohibit speech only if it is "directed to inciting or producing imminent lawless action and is likely to incite or produce such action."[89]  While recognizing the importance of protecting minors, the court noted that the idea of "teenagers engaging in sexual activity" was "a fact of modern society and has been a theme in art and literature throughout the ages," from Shakespeare's *Romeo and Juliet* to current films.[90]

There is no evidence that Lubbock GSA has ever incited illegal activity. On the contrary, the GSA has explicitly stated that "all members will be expected to be law abiding" and "[w]e will not be the ones making decisions about their sexuality."[91]  Educating young people about safe sex does not constitute incitement to illegal activity. If that were true, then the majority of school districts in the United States would be subject to criminal prosecution.[92]  The Centers for Disease Control, which has recommended that high school students receive information on condom use, would likewise be advocating illegal activity.[93]  The most that Defendants can establish is that Plaintiffs disagree with their position on safe sex. That is not a crime, nor is it an excuse to violate Plaintiffs' rights.

## B.   LISD May Not Exclude Gay And Lesbian Groups Based on General Fears of Harassment By Others.

The Fifth Circuit has emphasized that "there must be demonstrable factors that would give rise to any reasonable forecast by the school administration of 'substantial and material' disruption of school activities before expression may be constitutionally restrained. While this court has great respect for the intuitive abilities of administrators, such paramount freedoms as

---

[89]  *Id.* (quoting *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969)).

[90]  *Id.* at 247.

[91]  App. at 46.

[92]  About 58 percent of the school districts in the United States provide comprehensive sex education, which includes information on birth control and safer sex. Henry J. Kaiser Family Foundation, Sex Education in the U.S.: Policy and Politics at 1 (March 2002) (App. at 50).

[93]  Centers for Disease Control, National Center for Chronic Disease Prevention and Health Promotion,

21

speech and expression cannot be stifled on the sole ground of intuition."[94]  When school officials

claim that students' activities will disrupt the school, "something more is required to establish

that they would cause 'disruption' than the ex cathedra pronouncement of the superintendent."[95]

Defendants admit that Plaintiffs have not engaged in any disruptive activities.[96]  The sole

basis for Defendants' prediction of future disruption is the fear that other students might harass the

GSA members.  This fear, in turn, is based on some "concerned" phone calls[97] and the intuitive

judgments of other administrators with "experience under their belt."[98]

In *Tinker*, the Court explained that the "fear of a disturbance" does not justify such

curtailment, explaining that "in our system, undifferentiated fear or apprehension of disturbance

is not enough to overcome the right to freedom of expression. Any departure from absolute

regimentation may cause trouble. Any variation from the majority's opinion may inspire fear.

Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of

another person may start an argument or cause a disturbance. But our Constitution says we must

take this risk, and our history says that it is this sort of hazardous freedom -- this kind of

openness -- that is the basis of our national strength and of the independence and vigor of

Americans who grow up and live in this relatively permissive, often disputatious, society."[99]  In

order to justify a prohibition on the expression of an opinion, school officials must show

---

*School Health Guidelines* (App. at 56).

[94] *Shanley v. Northeast Ind. School Dist.*, 462 F.2d 960, 974 (5th Cir. 1972).

[95] *Butts v. Dallas Independent School Dist.*, 436 F.2d 728, 732 (5th Cir. 1971).

[96] App. at 62-65.

[97] Clemmons Deposition at 46 (App. at 35).  These anonymous calls were not threatening but expressed "concern" about "what might happen if these GAP Youth get to meet." *Id.*

[98] Clemmons Deposition at 46 (App. at 35).  Hardin also mentioned to name-calling incidents involving Ricky Waite, but those incidents had nothing to do with the exercise of any organizational activity and are irrelevant. Hardin Deposition at 25-27 (App. at 19-21).

[99] *Tinker*, 393 U.S. at 508-09 (citation omitted).

"something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint."[100]

In *Burnside v. Byars*,[101] which involved the wearing of "freedom buttons" by African-American students in Mississippi, the Fifth Circuit observed that it was unlikely that mere speech, in the absence of some sort of disruptive conduct, would ever justify restriction of students' First Amendment rights.[102] No doubt many Mississippi school officials in the 1960s regarded the civil rights movement as "disruptive," just as Defendants regards the Lubbock GSA as disruptive. Such "fear or apprehension of disturbance" was not a basis for denying First Amendment rights in the 1960s, and it is not a basis for denying First Amendment rights today. The Fifth Circuit has explained that "those students who would reasonably exercise their freedom of expression should not be restrained or punishable at the threshold of their attempts at expression merely because a small, perhaps vocal or violent, group of students with differing views might or does create a disturbance."[103]

In the specific context of a GSA, a court recently rejected the same argument that Defendants make – that denial of recognition of a GSA is justified because its formation "has caused some level of uproar" including complaints and questions from parents about how the GSA's "approval might affect the safety of their children."[104] The *Boyd County* court made clear that the right of gay straight alliances to meet cannot be subjected to a "heckler's veto." A school "may not deny equal access to a student group because student and community opposition to the

---

[100]   *Id.* at 509.
[101]   363 F.2d 744 (5th Cir.1966).
[102]   *See Burnside*, 363 F.2d at 748 ("Thus it appears that the presence of 'freedom buttons' did not hamper the school in carrying on its regular schedule of activities; **nor would it seem likely that the simple wearing of buttons unaccompanied by improper conduct would ever do so.**") (emphasis added).

23

group substantially interferes with the school's ability to maintain order and discipline, even though equal access is not required if the student group itself substantially interferes with student order and discipline."[105] The court explains that school administrators "are not permitted to restrict Plaintiffs' speech and association as a means of preventing disruptive responses to it."[106] Even Clemmons had to concede that school officials may not legally block a group merely because the members of that group express unpopular opinions that might lead to threats from other students.[107]

## VI. DEFENDANTS ARE LIABLE FOR DAMAGES.

Although Plaintiffs seek only nominal damages, it is necessary to correct some of Defendants' misstatements of the law regarding liability.[108] Defendants cite a number of cases regarding monetary damages under 42 U.S.C. § 1983 arguing that because the LISD's written "policy" regarding noncurricular student groups is facially constitutional, they are somehow immune from suit. What Defendants fail to note is that they have not been sued for promulgating an unconstitutional policy, but rather for their violation of that policy itself.

Furthermore, in paraphrasing the elements set out in *Meadowbriar Home for Children, Inc. v. Gunn*,[109] Defendants insert the word "unconstitutional" into the first factor, distorting its meaning. The actual elements are: "(1) a policy or custom existed; (2) the governmental policy makers actually or constructively knew of its existence; (3) a constitutional violation occurred; and (4) the custom or

---

[103] *Shanley*, 462 F.2d at 974.
[104] *Boyd Count*, 258 F.Supp.2d at 688.
[105] *Id.* at 690 (citing *Tinker*, 393 U.S. at 505-06).
[106] *Id.*
[107] Clemmons Deposition at 10 (App. at 32).
[108] Regardless of any dispute regarding the availability of money damages, there is no argument that the L.I.S.D. and the individual Defendants who have been sued in their official capacities are "persons" subject to

24

policy served as the moving force behind the violation."[110]

Based on their inaccurate rendition of the legal standard, Defendants argue that Plaintiffs must prove that LISD policymakers "had knowledge that policy was unconstitutional."[111] This is incorrect. As *Meadowbriar* states, Plaintiffs need to prove knowledge of the **existence** of the policy, not knowledge of the policy's unconstitutionality. In this case, the policy at issue is the denial of recognition to Lubbock GSA. It is undisputed that LISD policymakers were aware of that policy. As discussed above, a constitutional violation occurred when Defendants decided to deny recognition to the Lubbock GSA. This policy was, by definition, the moving force behind the violation.[112] Plaintiffs are therefore entitled to damages, in addition to appropriate injunctive and declaratory relief.

## CONCLUSION

Plaintiffs respectfully request that this Court deny Defendants' motion for summary judgment, grant Plaintiffs' motion for summary judgment and award Plaintiffs all appropriate relief.

---

injunctive relief under 42 U.S.C. § 1983. *Will v. Mich. Dept. of State Police*, 491 U.S. 58, n. 10 (1987)

[109] 81 F.3d 521 (5th Cir. 1996).

[110] *Id.* at 532-33.

[111] Defendants' Brief at 11.

[112] The purpose of the analysis is to "distinguish individual violations perpetrated by local government employees from those that can be fairly identified as actions of the government itself." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001). In cases such as this one, in which no one disputes that the policymakers were directly involved in the challenged decision, it is unclear whether such an analysis is even necessary. *See Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 694-95 (1978) ("Since this case unquestionably involves official policy as the moving force of the constitutional violation found by the District Court, . . . we have no occasion to address, and do not address, what the full contours of municipal liability under § 1983 may be."). In any event, all of the elements of municipal liability under section 1983 are satisfied in this case.

Respectfully Submitted,

LAMBDA LEGAL DEFENSE
AND EDUCATION FUND, INC.
3500 Oak Lawn Avenue, Suite 500
Dallas, Texas 75219-6722
(214) 219-8585 telephone
(214) 219-4455 facsimile


By:_____
    F. BRIAN CHASE
    Louisiana Bar Number 23450
    Florida Bar Number 996653


BARON & BUDD
A PROFESSIONAL CORPORATION
3102 Oak Lawn Avenue, Suite 1100
Dallas, Texas 75219
(214) 521-3605 telephone
(214) 520-1181 facsimile

KEVIN D. MCHARGUE
Texas State Bar No. 00792309
MONTY WADE SULLIVAN
Texas State Bar No. 24008105
CARLA M. BURKE
Texas State Bar No. 24012490
SCOTT L. FROST
Texas State Bar No. 24015156
CHRIS J. PANATIER

Attorneys for Plaintiffs

**Certificate of Service**

I certify that I mailed a copy of the foregoing by U.S. Mail to Ann Manning, McWhorter, Cobb and Johnson, L.L.P., P.O. Box 2547, Lubbock, Texas on November 8, 2003.

_____
By: F. BRIAN CHASE
Louisiana Bar Number 23450
Florida Bar Number 996653

26